In re GILROY & BLOOMFIELD.

(District Court, S. D. New York. September 26, 1905.)

No. 6,865.

1. BANKRUPTCY—ORDER TO SURRENDER PROPERTY—SUFFICIENCY OF PROOF.

It is only in clear cases, in which the proof is decisive, that a court of bankruptcy is justified in making a peremptory order requiring a third person to surrender property as assets of a bankrupt's estate, and such an order will not be made, where such person denies the receipt of the property and the only evidence to establish that fact is the testimony of interested witnesses, unsupported by documentary or corroborative proof.

2. SAME—EVIDENCE CONSIDERED.

Evidence considered, and *held* to fully establish the existence of a scheme, participated in by an alleged creditor of an insolvent firm and her attorney and others, to secure a preference to such creditor in anticipation of the firm's bankruptcy, and in pursuance of which, under advice of the attorney, the greater part of the firm assets were removed and disposed of or concealed, in fraud of its creditors; but such evidence *held* not sufficiently clear and decisive as to the disposition made of such property or its proceeds to warrant a summary order requiring the attorney to surrender the same to the firm's receiver in bankruptcy.

In Bankruptcy. On motion to confirm referee's report.

Bird & Tarbox and A. Gordon Murray, for receiver.

Arthur Furber and Abraham A. Joseph, for respondent Joseph.

HOLT, District Judge. This is a motion to confirm a referee's report, finding that Abraham A. Joseph, an attorney of this court, should be ordered to deliver to the receiver certain property and money belonging to the bankrupts' estate. Gilroy & Bloomfield, the bankrupts, were manufacturers of cloaks and suits in this city. Tobias Korn was formerly in the same business in this city, and went into bankruptcy in the fall of 1903. In January, 1904, Rosie Korn, the wife of Tobias Korn, claims to have loaned to Gilroy & Bloomfield about $9,000. Her husband, Tobias Korn, thereupon became connected with the business of Gilroy & Bloomfield, and it is a question whether Mrs. Korn became, by this transaction, a creditor or a partner. A man named Feinman, who was employed by Gilroy & Bloomfield, was a friend of Korn, and claims to have brought about the connection between Gilroy & Bloomfield and the Korns and to have loaned Mrs. Korn about $2,-300, to be used by her as part of her alleged loan. Shortly after the money was advanced the Korns consulted Joseph, claiming to have discovered that they had been induced to advance the money by fraud. Joseph advised them to keep their discovery a secret, and to endeavor to get back their money out of the business. Thereafter certain amounts were paid to Mrs. Korn, until the amount which she claims to be due her was reduced to about $5,000. On March 18, 1904, Joseph drew a bill of sale to Mrs. Korn of the assets of the firm of Gilroy & Bloomfield, and had Gilroy execute it. He applied to Bloomfield to also execute it, but Bloomfield refused. The firm had been insolvent for some time before, and Joseph admits that he knew it. The next day, Saturday, March 19th, Bloomfield brought a suit in the state Supreme Court, asking for a dissolution of the partnership and the appointment of a receiver. On that morning Joseph went to the office of Gilroy & Bloomfield. He called up the clerk of this court on the telephone and asked if any petition in bankruptcy had been filed against the firm, and was told that none had been filed. He then sent his clerk to the office of the clerk of this court, with instructions to wait there until after 12 o'clock, when the office closed, and then telephone him whether any such petition had been filed. After 12 his clerk telephoned him that the office was closed, and that no petition against Gilroy & Bloomfield had been filed. Thereupon Joseph gave orders to have all the employés of the firm dismissed, and they all left. He put his clerk on guard at the front door. He then directed Feinman to

select certain goods to be applied toward the payment of Mrs. Korn's claim. Feinman thereupon selected and took away for that purpose goods of the value of about $3,000. Joseph advised Gilroy to send another lot of goods to a man named Altschul, a sponger. Trucks were obtained, and goods were sent to Altschul that afternoon of the value of about $4,500. Gilroy also sold to a man named Taylor that morning goods to the value of about $1,200, which were also removed. The goods so removed that day constituted almost the entire stock of Gilroy & Bloomfield. On Monday a petition in bankruptcy was filed against the firm, and a receiver was appointed. In June, 1904, a proceeding was brought in this court upon a petition of the receiver, and an order issued requiring Rosie Korn, Tobias Korn, Abraham A. Joseph, and David L. Feinman to show cause why they should not be directed to deliver to the receiver the property taken away by them. The matter was referred to a referee to take testimony and report. Upon his report an order was made dismissing the proceedings as to Joseph and Tobias Korn, and directing Rosie Korn and Feinman to turn over to the receiver certain property or pay $2,650, the proceeds thereof. After this order was entered and served upon Mrs. Korn and Feinman they went to the receiver and stated that they had not the property or the proceeds, but that they had been delivered to and were held by Joseph. Thereupon an order was made reopening the proceedings as against Joseph. Evidence has been taken before the referee, and he has made a report, holding that Joseph received certain goods and money amounting to $7,500. This motion is made to confirm this report.

The order reopening the case referred the matter back to the referee "for further examination, testimony, and report as to so much of the prayer of said petitioner as relates to the respondent Joseph, and for such other and further relief as may be just." Under the last clause of this order the referee, in his report, has charged some of the parties, other than Joseph, with certain amounts, but I think it clear that as to them the report should not be confirmed. None of the other parties received notice of the rehearing, or were present or represented upon the rehearing, and I think that no liability, in addition to that imposed by the first order, can be properly imposed upon them in this proceeding.

Upon the question of the liability of Joseph I have given careful consideration to the evidence. The referee has found that Joseph is chargeable with the goods which were sent to Altschul or $4,500, their value, with $1,750, alleged to have been delivered to him by Mrs. Korn, and with $1,250, alleged to have been paid to him by Gilroy, making in all $7,500. A very large amount of testimony has been taken, but a comparatively small amount of it has any direct bearing upon the question whether these goods and this money were actually deposited with Joseph.

In respect to the goods sent to Altschul, the only evidence that Joseph holds them is Gilroy's testimony that on March 24th he gave Joseph an order, dated March 19th, at Joseph's suggestion, made out to bearer, for the goods, and Altschul's testimony that those goods were on

March 21st delivered by Altschul on the order to a truckman. The truckman is not produced. There is no evidence showing what the truckman did with the goods or where the goods are now. Gilroy does not testify whether he ever afterwards asked Joseph or learned from any source where these goods were or what had become of them. Joseph denies absolutely that he ever received the order or obtained the goods.

On the question of the alleged payment of the $1,750 in cash by Mrs. Korn to Joseph the evidence is confused and conflicting. In the affidavit made by Mrs. Korn, upon which the case was reopened, it is stated that this $1,750 was paid to Joseph on or about April 5, 1904, at his office, 302 Broadway, New York. In the evidence taken before the referee, Mr. and Mrs. Korn and Feinman at first fixed upon that time and place as the time and place at which the payment was made. It having been subsequently proved that Mrs. Korn received an injury to her knee in the latter part of March, which confined her to her house until the latter part of April, these witnesses changed their testimony and said that the payment was made after the 1st of May, at Joseph's new office, at 350 Broadway; he having moved his office on the 1st of May from 302 to 350 Broadway. Mrs. Korn and Feinman testified that this $1,750 was money which Feinman had received upon the sale of some of the goods which had been given him, and that he had given the money to Mrs. Korn, and she had placed it in the safe deposit vaults of the Mount Morris Bank, where she had a box. Lesser, who bought the goods from Feinman, testified that he did not give the money to Feinman, but gave it to Mr. Korn. Mrs. Korn testified that the money remained in the safe deposit vaults until the day she took it down to Joseph's office, and that on the morning of the day of payment she went to the safe deposit vaults and took the money out, and went, with Feinman, to Joseph's office, where she paid it to Joseph; he promising to hold it in trust, and either to pay it to the receiver, if so ordered, or to return it to her, if not so ordered. Feinman testified that Joseph promised to return it to him (Feinman) on account of the $2,300 advanced by him, if it was not ordered to be paid to the receiver. Feinman's story is that, on the morning the money was to be paid, he went to Korn's house and rang the bell, and Mrs. Korn put her head out of the window and said she would dress and come along with him, that she was not fully dressed at that time, and that he did not go into the house, but waited outside until she came down, and they then went direct from the house to Joseph's office, and did not go to any safe deposit company to get the money. The manager of the safe deposit company testified that he had charge of the safe deposit vaults, that it was his custom to make an entry on the books of the company of every call made by any person at the vaults, and that the only entries of any visits by Mrs. Korn to the vaults were on December 7, 1903, December 12, 1903, and June 6, 1904, when the box was given up. Mr. and Mrs. Korn and Feinman all concur that the $1,750 was paid in bills and no receipt taken. No explanation is given why in May, about six weeks after the bankruptcy, and nearly as long a time after this money had been safely on deposit in a safe

deposit vault, Joseph should have suggested that the money had better be given to him to hold, except his alleged statement that they might be ordered to surrender it to the receiver. The first proceeding brought by the receiver to compel restitution was not begun till June. Joseph denies absolutely that the $1,750 was ever given to him, or that anything of the kind ever took place.

In respect to the alleged payment of $1,250 by Gilroy to Joseph, Gilroy testified that at various times, beginning March 19th, and for several weeks thereafter, he paid Joseph different amounts, aggregating $1,250, and that all the payments were in bills, and no receipts were taken. Joseph admits that he received from Gilroy, on Saturday and Sunday before the bankruptcy, $300 for legal services, and that he subsequently received $100, which Gilroy borrowed from Altschul, and he denies that he received any more money from Gilroy. Of course, if Joseph's story is true, the $300 paid him for legal services before the bankruptcy, even if paid in anticipation of bankruptcy, may be re-examined by the court on the petition of the trustee, pursuant to the provisions of section 60d, c. 541, Act July 1, 1898, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3446], but, in my opinion, would not be liable to be summarily ordered to be repaid, except after an investigation of the question whether the fee was unreasonable, and, as to the $100 which Joseph says was the proceeds of a loan made to the bankrupt after the bankruptcy, if that testimony is true, that amount, of course, was no part of the estate in bankruptcy.

Upon such evidence I cannot bring myself to the conclusion that a summary order ought to be made. It is a serious case. Gilroy, Feinman, the Korns, and Joseph all entered into a scheme to prefer Mrs. Korn, if she is a creditor having a valid debt, and to hide all the property from the creditors, and they have successfully done so. Joseph planned the details and supervised the operation of the scheme, and is the one most responsible morally for the wrong done to the creditors; but, in my opinion, it will not do to make summary orders against third parties upon such evidence as this. Feinman and Mrs. Korn, having been ordered, in the first proceeding, to pay back a portion of this property, promptly made an alleged confession to the receiver, asserting that the goods and the proceeds had all been given to Joseph to hold. The proceedings against Joseph are based substantially on their evidence and that of Gilroy. That the goods and their proceeds may have been given to Joseph to hold seems, perhaps, not improbable, but the evidence offered in this case against Joseph is, on its face, full of contradiction and improbabilities. It is given by witnesses who admit that they were engaged in a deliberate attempt to conceal the property and cheat the creditors, upon whose veracity presumably no reliance can be put. Their testimony differs radically from that given on the first proceeding, and is given to exculpate themselves from the liability imposed upon them in that proceeding. And yet there is much in the story which seems probable. I think that, if the case had been tried by a jury, they might probably have found a verdict against Joseph for the same amount with which the referee has charged him. But the difficulty is that this proceeding is not a trial before a jury, or upon

issues before a court, but is a summary proceeding, and in my opinion the law never intended that a peremptory order should be made in a summary proceeding against a third party on such evidence as this. It is only in clear cases, in which the proof is decisive, that the court is justified in making a peremptory order of this kind, especially against a third party, and he an officer of the court. I do not recall any case in which such an order has been made, where the fact of the original receipt of the property is denied, and particularly where the only proof that it was ever received is the mere oath of interested witnesses, unsupported by corroborative or documentary proof. It would be a dangerous precedent to establish, if bankrupts, charged with concealing assets, could simply, by asserting that their attorney had taken the property, make him liable to orders of this kind upon their unsupported testimony. The simple truth is that the receiver in this case has mistaken the remedy. He and his attorneys have given great labor and attention to this case, and are entitled to commendation for their efforts, and it is with regret that I find myself unable to confirm the referee's report, for Joseph ought to be legally liable for all the property which has disappeared. It is a serious defect in the bankrupt law that it contains no adequate provisions for criminal punishment for the fraudulent concealment of property in contemplation of bankruptcy. There is no class of questions in bankruptcy which give rise to so much difficulty as these summary proceedings to compel the return of property or money to the trustee. It frequently happens that, while the evidence is such as to make it quite probable that the trustee is entitled to the property, an order cannot be made because of the want of certainty and conclusiveness in the proof. Attorneys for trustees should not bring such proceedings without having decisive evidence to support them. In all cases of doubt, a plenary suit is the proper proceeding. Such a suit may still be brought in this case, and any order made in this proceeding may provide that it is without prejudice to such a suit.

But, although, in my opinion, the evidence in this case does not justify a peremptory order that Joseph pay over this money, the evidence does tend to show professional misconduct on his part in this proceeding of so grave a character that it should be made the subject of further investigation. · His claim is substantially that, until actual proceedings in bankruptcy were begun, it was legal for the firm of Gilroy & Bloomfield to turn over their property to Mrs. Korn in payment of her claim, and that, although such payment might be a preference under the bankrupt act, liable to be set aside in a suit by a trustee, it was entirely valid when made, and he was justified in advising it. But he advised, not only the transfer of property with which to pay Mrs. Korn, but a substantial secretion and concealment of most of the rest of the property. Even assuming that nothing that he did before the petition in bankruptcy was filed was illegal, he continued, after the petition was filed, advising and assisting in carrying out the general scheme for the concealment of the property and for preventing its application to the payment of the bankrupt's debts. · His conduct was, in its nature, similar to that of a lawyer who knowingly lends his professional assistance to thieves in concealing property which they have stolen.

Moreover, the testimony which he gave, when examined under oath before Commissioner Alexander, appears to be, in many respects, entirely irreconcilable with the testimony which he has given before the referee in this case, and with many of the conceded facts in the case. In view of all these facts, I direct that the facts in this case be submitted to the grievance committee of the Bar Association of this city, for the purpose of considering whether proceedings shall be instituted against Joseph for his disbarment from the state courts and from this court. The receiver is also directed to give careful consideration to the question whether there are any civil or criminal proceedings which can be brought against any of the parties to the proceedings, by which substantially the whole of this estate has been abstracted and concealed.