In re U.S.A. DIVERSIFIED PRODUCTS, INC., Debtor.

R. David BOYER, Trustee, Plaintiff,

v.

Paul DAVIS, Candice Davis, Michigan National Bank and Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Defendants.

Bankruptcy No. 92–12615.
Proc. No. 93–1080.

United States Bankruptcy Court,
N.D. Indiana,
Fort Wayne Division.

Sept. 14, 1995.

Robert Nicholson, Fort Wayne, IN, for Plaintiff.

Thomas P. Yoder, Fort Wayne, IN, for Carlton, Fields.

## DECISION

ROBERT E. GRANT, Bankruptcy Judge.

This matter is before the court following trial of the issues raised by plaintiff's complaint as to the defendant, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. The complaint has been filed pursuant to § 542 of the United States Bankruptcy Code. By it, the trustee seeks the sum of $125,000.00 that Carlton, Fields held in its trust account on and after the date of the petition for relief. The trustee claims these funds constitute property of the estate.

On December 8, 1992, Society National Bank, Indiana, a secured creditor of the

debtor, initiated an action in the Elkhart Superior Court against the debtor. In doing so, it obtained a prejudgment attachment on all of the debtor's assets. Two days later, on December 10, 1992, the debtor filed a petition for relief under Chapter 11. The bank filed an emergency motion for the appointment of a Chapter 11 trustee on December 11, 1992. The motion was granted and, by its order of December 16, 1992, the court instructed the United States Trustee to appoint an individual to serve as trustee in the case. The United States Trustee filed its notice of the appointment of Steven Goldberg as trustee on December 21, 1992, which was subsequently approved by the court.

Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. is a professional corporation of attorneys with its principal office in Tampa, Florida. Prior to the petition for relief under Chapter 11, Carlton, Fields was engaged to represent the debtor and its officers, Paul Davis and his wife Candice Davis, in litigation pending in Florida. In connection with this representation, on September 23, 1992, the debtor gave Carlton, Fields its check in the sum of $12,500.00 as a fee retainer and cost deposit.[1] Daniel Johnson, an associate, and Gregory Jones, a shareholder, were the primary attorneys handling the Florida litigation.

Prior to and after the filing of the bankruptcy case there existed an account numbered 675–07A76 at Merrill Lynch, Pierce, Fenner & Smith, Inc., in the name of UDI, Inc. On December 9, 1992, Paul Davis caused $125,000.00 to be wire-transferred from the Merrill Lynch account to Carlton, Fields. That money was deposited in Carlton, Fields' trust account. The purpose of the transfer was to fund a possible settlement of the Florida litigation.[2]

Carlton, Fields learned of debtor's bankruptcy on December 14, 1992. On that date, Johnson spoke with Davis by telephone and Davis informed him that U.S.A. Diversified had filed a petition for relief under Chapter 11. When Johnson asked about the ownership of the funds recently wired to Carlton, Fields, Davis informed him that it was "... [his] personal money." Following this conversation, Johnson sent a message to Jones regarding the debtor's bankruptcy filing, suggesting steps that should be taken as a result, such as filing a notice of the automatic stay in the Florida litigation and seeking to have Carlton, Fields authorized by the bankruptcy court to represent the debtor in that litigation. Jones never received this message and Johnson did not follow up with his suggestions to see if they had been implemented. They never were.

The settlement efforts were unsuccessful and, on February 10, 1993, Davis instructed Jones to send the money in the trust account to him, less an amount sufficient to pay an outstanding bill for fees and to replenish the retainer. Jones initiated the process to disburse the money soon thereafter. On February 18, 1993, $14,066.05 was applied to Carlton, Fields' attorneys fees due on account of the Florida litigation. On February 24, 1993, Jones mailed a check, dated February 22, 1993, drawn on Carlton, Fields' trust account for the balance of the funds, $110,933.95, along with a cover letter, to Davis to an address specified by Davis.

Two days before it mailed the money to Davis, Carlton, Fields received a letter dated February 10, 1993, from the trustee's counsel. This letter, which was addressed to Jones, again advised Carlton, Fields of the pending Chapter 11 and informed it that a Chapter 11 trustee had been appointed. The letter requested a status report on all matters for which debtor had retained Carlton, Fields and instructed it to take no action other than informing all interested parties of the bankruptcy. Jones, however, did not see the letter at this time because it was placed in the file without being brought to his attention.

1. This check was drawn on the account of U.S.A. Diversified Products, Inc. and was imprinted with the corporation's address as 1001 W. Brooklyn, P.O. Box 505, Syracuse, Indiana 46567. Carlton, Fields' engagement letter, dated September 22, 1992, was addressed to Mr. Davis at "USA Diversified Products, 1001 W. Brooklyn, Syracuse, Indiana 46567."

2. Neither the Florida litigation nor the funds in Carlton, Fields' trust account were disclosed on the debtor's bankruptcy schedules or statement of affairs.

The case was converted to Chapter 7 on February 23, 1993, and R. David Boyer was appointed the Chapter 7 trustee.

By May 21, 1993, the trustee learned of the $125,000.00 wire transfer into Carlton, Fields trust account. By a letter of that date, the trustee's counsel informed Jones of the conversion to Chapter 7, the trustee's claim to the trust funds and directed Carlton, Fields "not to transfer any funds on behalf of U.S.A. Diversified without written instructions from Mr. Boyer." By this time, however, Carlton, Fields had already transferred the remaining balance of the wire-transfer funds to Davis. Jones first saw the February 10, 1993 letter from the trustee's counsel when he summoned the file as a result of receiving the letter of May 21, 1993. Immediately upon receiving the letter of May 21, Carlton, Fields informed the trustee of the disbursement of the Merrill Lynch wire-transfer funds to Davis and provided copies of the pertinent documents. The trustee initiated this adversary proceeding to recover the funds on May 28, 1993.

■ Section 542 of the United States Bankruptcy Code identifies the duties imposed upon those in possession of property of the bankruptcy estate. In part, it requires:

> ... an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of the title, or that the debtor may exempt under section 522 of this title, shall deliver to the

trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate. 11 U.S.C. § 542(a).

This section, thus, lays down a general rule that "any property of a debtor's estate held by any entity must be turned over to the trustee...." *In re NWFX, Inc.*, 864 F.2d 593, 596 (8th Cir.1989). The obligation to do so is "self-operative and mandatory." *Matter of Larimer*, 27 B.R. 514, 516 (Bankr.D.Idaho 1983). "There is no requirement in the Code that the trustee make demand, obtain a court order, or take any further action in order to obtain a turnover of the estate's property." *Id.; see also, In re Bidlofsky*, 57 B.R. 883, 900 (Bankr.E.D.Mich. 1985); *In re Lucas*, 100 B.R. 969, 973 (Bankr.M.D.Tenn.1989), *rev'd on other grounds*, 924 F.2d 597 (6th Cir.1991), *cert. denied, Forbes v. Holiday Corp. Savings and Retirement Plan*, 500 U.S. 959, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991).

■ In an action to compel compliance with § 542, the trustee carries the burden of proof. *See In re High Sierra Transport, Inc.*, 101 B.R. 432, 434 (Bankr.M.D.Pa.1989). In order to do so, it must prove that: 1) during the case; 2) an entity other than a custodian; 3) was in possession, custody or control; 4) of property that the trustee could use, sell or lease; and 5) that such property is not of inconsequential value or benefit to the estate. The parties, citing to *In re Hill*, 156 B.R. 998, 1006 (Bankr.N.D.Ill.1993), agree that the trustee must carry this burden by clear and convincing evidence.[3]

---

**3.** The origin for the clear and convincing standard in turnover proceedings is the Supreme Court's decision in *Oriel v. Russell*, 278 U.S. 358, 362, 49 S.Ct. 173, 174, 73 L.Ed. 419 (1929). There, in a review of contempt proceedings, the Court was called upon to consider the propriety of the trial courts' refusal to receive evidence concerning the contemnors' claimed disposition of the property in question prior to the entry of the turnover order. The courts below had determined that the turnover order could not be collaterally attacked and the only relevant evidence in the contempt proceeding was that which would tend to show a change in circumstances since the date of the turnover order. In the Supreme Court, the contemnors argued that a finding of contempt required a greater weight of evidence than a turnover order, thereby, permitting a re-examination of all the evidence. Thus, the Court was confronted with the question of

whether an order of turnover under the Bankruptcy Act should be supported by clear and convincing evidence, the standard required for a finding of contempt, or merely by a preponderance.

The Court concluded, "turnover ... should be supported by clear and convincing evidence." 278 U.S. at 362, 49 S.Ct. at 174. It did so based upon the proposition that: "It is a charge equivalent to one of fraud, and must be established by the same kind of evidence required in a case of fraud in a court of equity. A mere preponderance of the evidence in such a case is not enough." *Id.*

As discussed more fully below, *see*, pp. 878–79, the nature of a turnover proceeding under § 542 of the United States Bankruptcy Code is dramatically different from the proceeding of the same name under the old Act. Nothing in § 542 carries any suggestion or imputation of fraud on the

Measuring the evidence and the arguments which have been presented to the court against the elements the trustee is required to prove in connection with its prima facie case, there is no dispute that Carlton, Fields is an entity other than a custodian. Neither is there any question that Carlton, Fields had the $125,000.00 at issue in its trust account during the case. Furthermore, no one suggests that this amount of money is of inconsequential value and benefit to the bankruptcy estate. Instead, the present dispute focuses upon whether the property in question was property of the bankruptcy estate, whether Carlton, Fields was in possession, custody or control of that property and the nature of a turnover defendant's obligation to deliver and account for such property, or the value of such property. If these issues are resolved in favor of the trustee, the court must address the Carlton, Fields' equitable defense that it did not know the money in its trust account was property of the estate.

■■■■ The obligation to turnover property imposed by § 542(a) extends to "property that the trustee may use, sell, or lease under section 363...." 11 U.S.C. § 542(a). "Sub-

sections (b) and (c) of § 363 authorize the trustee to use, sell or lease any 'property of the estate' ..." *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 203, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1983). Property of the estate is, in turn, defined by § 541 of the United States Bankruptcy Code and includes "all legal or equitable interests of the debtor in property as of the commencement of the case"—"wherever located and by whomever held." 11 U.S.C. § 541(a)(1). Consequently, this aspect of a turnover proceeding essentially reduces itself to the inquiry of whether or not the property in question is property of the bankruptcy estate, as defined by § 541(a) of the United States Bankruptcy Code.[4]

The question of whether the money in Carlton, Fields' trust account was or was not property of the estate, results from a dispute over who owned the Merrill Lynch account from which those funds were wired to the defendant—the debtor or debtor's principal, Paul Davis. Carlton, Fields contends that Davis was the owner of the account, primarily because of Davis' statement to Johnson that the wired funds were his money. Despite this statement, the court finds that the debtor was the owner of the Merrill Lynch

part of the turnover defendant. Thus, the original predicate for the Court's decision to require clear and convincing evidence no longer exists.

Since 1929 the Court has taken the opportunity to elaborate upon the circumstances which will require a burden of proof greater than a preponderance of the evidence. *See e.g. Herman & MacLean v. Huddleston*, 459 U.S. 375, 387–91, 103 S.Ct. 683, 690–92, 74 L.Ed.2d 548 (1983). One of its most recent pronouncements on the subject arose in the context of a bankruptcy case and addressed the creditor's burden of proof in proceedings under § 523 of the United States Bankruptcy Code. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). There, it stated the general rule on the subject as follows:

> Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless particularly important individual interests or rights are at stake. *Id.*, at 286, 111 S.Ct. at 659 (internal quotation marks and citations omitted).

It then noted that the debtor had no fundamental right to discharge its debts in a bankruptcy proceeding. Thus, the debtor's interest in obtaining a discharge was not sufficient to require a

heightened burden of proof. It came to this conclusion notwithstanding the fact that the creditor sought a declaration that the obligation to it arose out of debtor's fraud.

Given the fundamental difference between turnover proceedings under the Code and proceedings of the same name under the old Act, combined with the Supreme Court's current rule for determining when a standard other than a preponderance of the evidence is required in civil proceedings, it is doubtful that the need to prove turnover by clear and convincing evidence, as required by *Oriel*, survived the enactment of § 542. Nonetheless, since both parties have agreed that the trustee must prove his case by clear and convincing evidence, the court applies that standard to the matter before it.

4. The nature of a debtor's interest in property is determined by state law. *Butner v. U.S.*, 440 U.S. 48, 55–56, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *Matter of Yonikus*, 996 F.2d 866, 869 (7th Cir.1993). In this case, the state law principles concerning funds held in an attorney's trust account are so fundamental that they are not questioned. Property held in an attorney's client trust account belongs to the client and the attorney is required to deliver that property to the client upon request. *See* Fla.St. Bar R. 4–1.15; *Wilkerson v. Olcott*, 212 So.2d 119 (Fla.App. 1968).

account. That account was in the name of UDI, Inc., under debtor's federal tax identification number. There was no separate entity known as UDI, Inc. Instead, this name was chosen as some sort of acronym for USA Diversified Products, Inc.. Furthermore, the address for UDI, Inc. stated on the account was P.O. Box 505 in Syracuse, Indiana; the same as the debtor's. Lastly, there was a corporate resolution authorizing the wire transfer into defendant's trust account. Based upon the evidence presented, the court finds that the debtor was the owner of the account from which the $125,000.00 in question was wire transferred into Carlton, Fields' client trust account. Consequently, the funds in defendant's trust account not only came from, but also belonged to, the debtor. They were not the property of Paul Davis. Those funds became property of the estate, with debtor's petition for relief under Chapter 11 of the United States Bankruptcy Code on December 10, 1992.

Given that the money in question was held in Carlton, Fields' trust account, the court also finds that Carlton, Fields was "in possession, custody, or control" of property of the estate during the case. Carlton, Fields' arguments to the contrary are not persuasive. To the extent the arguments are based upon the Seventh Circuit's decision *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir.1988), that decision has no applicability to the case before the court. There, the Seventh Circuit was considering the scope of § 550 of the United States Bankruptcy Code and the liability of various transfer*ees* of avoided transfers. By its own terms, § 550 applies only with regard to transfers which are "avoided under §§ 544, 545, 547, 548, 549, 553(b), or 724(a)." It has no applicability to proceedings under § 542 of the United States Bankruptcy Code. Section 542 requires the court to consider the obligations of those who had possession, custody or control of property of the estate and their liability, if any, as transfer*ors* of that property. Thus, to the extent

Carlton, Fields argues that it was not in possession, custody or control of property, because it did not have "the right to put the money to [its] own purposes", *Bonded Financial Services*, 838 F.2d at 893, the argument is irrelevant. The possession, custody or control required by § 542 does not require an assertion of economic self-interest in the property.

In the same fashion, the court does not accept Carlton, Fields' arguments that, because the funds were held in its client trust account, the applicable Rules of Professional Conduct, Fla.St. Bar R. 4–1.5, somehow lead to the conclusion that it was not in possession, custody or control of them. This rule provides:

> [A] lawyer shall promptly deliver to the client ... any funds or other property that the client ... is entitled to receive.... Fla.St. Bar R. 4–1.5(b).

The fact that Carlton, Fields had the ability and the obligation to deliver the funds clearly indicates that Carlton, Fields had some degree of possession, custody or control over that property.[5]

Because Carlton, Fields was in possession, custody or control of property of the estate, it was obligated to deliver the funds in its trust account to the trustee. It is not able to do so now, because it delivered those funds to Paul Davis, by a check mailed to him on February 24, 1993. As a result, the trustee seeks to recover "the value of" the funds in the trust account. In opposition, Carlton, Fields argues that present possession is a pre-requisite to turnover and, in the absence of such possession, its only obligation is to "account for" the property in question. It contends that it has fulfilled this obligation, through its undisputed explanation that the money was given to Davis.

Carlton, Fields' argument seemingly reads critical portions of § 542(a) out of the statute. The obligation to turnover extends

---

**5.** Just as it was able to deliver the funds to Paul Davis, it also had the ability to deliver them to the trustee. To the extent that Carlton, Fields suggests that Rule 4–1.5(b) gave it no choice but to deliver the money to Paul Davis, the court does not agree. Counsel's acknowledged obligation was to deliver the funds to its client.

While the court has no quarrel with Carlton, Fields' perception of its obligation to its client, the underlying question in this case is which of its clients was it required to deliver the money to. The present problem exists because the money was delivered to the wrong one.

not just to property *presently* in someone's possession, custody or control but to property in its "possession, custody or control *during the case.*" Furthermore, if a lack of present possession, combined with an explanation, constituted sufficient compliance, little, if any, purpose would be served by the statutory alternative of requiring delivery of "the value of such property."

Despite the seemingly straight forward language of § 542(a), there is authority for Carlton, Fields' argument. *See In re Bell & Beckwith,* 44 B.R. 659, 660 (Bankr.N.D.Ohio 1984); *In re Gailey, Inc.,* 119 B.R. 504, 514 (Bankr.W.D.Pa.1990); *Yaquinto v. Greer,* 81 B.R. 870, 878 (N.D.Tex.1988); *but see, In re Robertson,* 105 B.R. 440, 455–58 (Bankr. N.D.Ill.1989); *In re Borchert,* 143 B.R. 917, 919 (Bankr.D.N.D.1992); *In re Burke,* 150 B.R. 660, 662–63 (Bankr.E.D.Tex.1993). In addressing a similar argument, the court in *Bell & Beckwith* stated:

> A review of the statute finds that it addresses situations where an entity is in present possession of property which the trustee has claimed to be part of a debtor's estate. It is, therefore, academic that if an entity previously in possession of the estate property is no longer in possession of the property, they cannot be made subject to an order of turnover based on 11 U.S.C. § 542. Agen has accounted for the funds which were, admittedly, at one time, in her possession. Accordingly, she has complied with the only portion of the statute that is presently applicable to her. *Bell & Beckwith,* 44 B.R. at 660 (citations omitted).

Relying on this proposition, Carlton, Fields argues that, absent proof of tortious or other wrongful conduct, *see Gailey,* 119 B.R. at 514, it has no obligation beyond explaining what happened to the property of the estate that was once in its possession.[6]

The need for present possession to support a turnover order dates back to at least 1948, when the Supreme Court decided *Maggio v. Zeitz,* 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948). There, the Court was called upon to review orders of commitment for contempt, due to the contemnor's failure to comply with turnover orders. In doing so, the Court found it necessary to review the origin, nature, and purpose of turnover proceedings under the old Bankruptcy Act. It was in connection with this review that the Court made its observations about the need for present possession.

> The turnover procedure is not one expressly created or regulated by the Bankruptcy Act. It is a judicial innovation by which the court seeks efficiently and expeditiously to accomplish ends prescribed by the statute, which, however, left the means largely to judicial ingenuity.

> \* \* \* \* \* \*

> [C]ourts of bankruptcy have fashioned the summary turnover procedure as one necessary to accomplish their function of administration. It enables the court summarily to retrieve concealed and diverted assets or secreted books of account the withholding of which, pending the outcome of plenary suits, would intolerably obstruct and delay administration. When supported by "clear and convincing" evidence, the turnover order has been sustained as an appropriate and necessary step in enforcing the Bankruptcy Act.

> But this procedure is one primarily to get at property rather than to get at a debtor. Without pushing the analogy too far, it may be said that the theoretical basis for this remedy is found in the common law actions to recover possession—detinue for unlawful detention of chattels and replevin for their unlawful taking—as distinguished from actions in trespass or trover to recover damages for the withholding or for the value of the property. Of course, the modem remedy does not exactly follow any of these ancient and often overlapping procedures, but the object—possession of specific property—is the same. The order for possession may extend to the proceeds of property that has been disposed of, if they are sufficiently identified as such. But it is essentially a proceeding for restitution rather than indemnification, with some characteristics of a proceeding *in rem;* the primary condition of relief is possession of

---

6. Of course, the argument assumes that the delivery of property to someone other than its rightful owner and to someone other than the one who is lawfully entitled to possession of it is not, in itself, wrongful.

existing chattels or their proceeds capable of being surrendered by the person ordered to do so. It is no sense based on a cause of action for damages for tortious conduct such as embezzlement, misappropriation or improvident dissipation of assets. The nature and derivation of the remedy make clear that it is appropriate only when the evidence satisfactorily establishes the existence of the property or its proceeds, and possession thereof by the defendant at the time of the proceeding.... [W]e do not consider resort to this particular proceeding appropriate if, at the time it is instituted, the property and its proceeds have already been dissipated, no matter when that dissipation occurred. Conduct which has put property beyond the limited reach of the turnover proceeding may be a crime, or, if it violates an order of the referee, a criminal contempt, but no such acts, however reprehensible, warrant issuance of an order which creates a duty impossible of performance so that punishment can follow. *Maggio*, 333 U.S. at 61–64, 68 S.Ct. at 404–405 (citations omitted).

The Court's discussion of turnover proceedings and the need for present possession cannot be fully understood without reference to the procedures which existed under the former Bankruptcy Act. Under the Act, "[a] bankrupt's estate vests in his trustee at the date of the petition in bankruptcy. The right of the trustee to recover the property as of that date is clear, but the remedy to be pursued for the purpose has been the subject of controversy." *Shortridge v. Utah Savings & Trust Co.*, 40 F.2d 328, 329 (10th Cir.1930). This controversy was created by the distinction between summary and plenary jurisdiction. In *Maggio*, the Court was clearly discussing "the summary turnover procedure," which was a judicially created aid to bankruptcy administration, rather than "plenary suits."

In one sense, the distinction between summary and plenary proceedings was largely procedural. Plenary proceedings were conducted with all of the hallmarks and formalities of traditional civil litigation. Summary proceedings, on the other hand, were less formal and could be more abbreviated. Their theoretical justification lay in the bankruptcy court's authority over property which was actually or constructively in its possession and its authority to administer the bankruptcy case before it. On a more fundamental level, however, if a particular dispute did not fall within the bankruptcy court's summary jurisdiction, the bankruptcy court could not resolve it in the face of an objection to its doing so. Absent consent, such a matter had to be resolved by a plenary action in either the district court or the state courts. *See generally*, 2 Collier on Bankruptcy ¶ 23.02, 23.03, 23.08, 23.12 (14th ed. 1995); 5 Remington on Bankruptcy, §§ 2135–2136 (5th ed. 1953).

Beyond the procedural differences between summary and plenary proceedings and the question of the appropriate court in which a particular proceeding should be brought, there were also differences in the manner by which the orders resulting from them could be enforced. "[J]udgment[s] in summary proceedings may require payment or delivery over forthwith, under penalty of contempt, whereas a plenary judgment would have only the same effect as a judgment in an independent action." 5 *Remington on Bankruptcy*, § 2136 at 277. Thus, a summary turnover order could be and usually was enforced by contempt proceedings. 5A *Remington on Bankruptcy*, § 2457 at 264; *see also, Matter of Glostex Products, Inc.*, 295 F.2d 324, 325 (7th Cir.1961) (whether or not an order is a turnover order is determined by the nature of the remedy contemplated), *cert. denied, Klein v. Herman*, 369 U.S. 828, 82 S.Ct. 846, 7 L.Ed.2d 794 (1962).

The fact that a summary turnover order was enforced through contempt proceedings played a large role in the development of the requirement for present possession in order to support the order. Numerous courts, including *Maggio*, were troubled by the possibility that a turnover order might be issued against a party who could not possibly comply with it, because the property in question was no longer in its possession, and then attempt to force that party to do the impossible through contempt proceedings. *Maggio*, 333 U.S. at 62–64, 68 S.Ct. at 405; *see also, In re Rosser*, 101 F. 562, 565 (8th Cir.1900); *American Trust Co. v. Wallis*, 126 F. 464,

466 (3d Cir.1903). It was in an effort to avoid such an absurd and unfair situation that the requirement of present possession arose. The lack of present possession did nothing more than insulate a party from a *summary* turnover order and subsequent attempts to enforce it through contempt proceedings. The lack of present possession was not a total absolution from liability. It meant only that the trustee was required to initiate a plenary proceeding in an effort to obtain a money judgment for what the turnover respondent no longer possessed.

That the lack of present possession did not absolve the turnover respondent from all liability is implicit in the Supreme Court's decision *Bank of Marin v. England*, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). That action involved a trustee's effort to recover funds on deposit with the bank as of the date of the petition which, when the trustee sought to recover them, were no longer in its possession. Without knowledge of the petition, the bank had honored pre-petition checks drawn on the debtor's account. In addressing the arguments presented to it, the Court felt compelled to create an equitable exception to the rule which otherwise imposed liability on the bank. It concluded that it would be inequitable to impose liability on the bank where it had done nothing more than honor its depositor's checks without any knowledge of the bankruptcy proceeding. Thus, the trustee was not permitted to recover the funds originally on deposit. If the lack of present possession was sufficient to absolve the defendant from all liability, there would have been absolutely no need for the Court to create the equitable exception that it did.

Other decisions under the Act make explicit what is simply implicit in the Supreme Court's decision of *Marin*, i.e., the lack of present possession did not absolve the defendant of all liability; it merely required the use of a different proceeding or consent.

In the event that a bankruptcy court assumes summary jurisdiction in a case where the disputed property is not within its actual or constructive possession, or where the claim is in fact adverse, and not merely colorable or frivolous, the adverse claimant may have the order of the bankruptcy court set aside. That result is without prejudice and simply requires the trustee to resort thereafter to some form of plenary suit in order to establish his claim. *In re Industrial Associates, Inc.*, 155 F.Supp. 866, 868–69 (E.D.Penn.1957) (citations omitted).

Consequently, when courts were faced with summary turnover proceedings brought against those no longer in possession of the property in question, it was not uncommon, in reviewing the propriety of the bankruptcy referee's actions, to emphasize that although turnover was not available, due to the lack of present possession, that result did not prejudice the trustee's right to bring a plenary action in a court of appropriate jurisdiction.

Summary proceedings of the type here in question are inappropriate when a trustee in bankruptcy seeks to recover damages for a wrongful act which prevents him from bringing into the bankruptcy estate converted property.... The established rule is that a turnover order cannot be made unless the party proceeded against at that time has possession of the specific property sought to be recovered as part of the bankrupt's estate.

\* \* \* \* \* \*

Since the funds here in question were not in the possession or under the control of the appellees at the time of the hearing before the Referee in Bankruptcy, the holding of the District Court as to the inappropriateness of the summary proceeding was proper. *A plenary proceeding should have been pursued.* In re *Welded Construction, Inc.*, 339 F.2d 593, 594 (6th Cir.1964) (emphasis added).

It is thus quite clear that the Trustee sought to recover neither specific merchandise nor a specific sum of money representing proceeds from the sale of said merchandise, but, instead, proceeded on a theory of indebtedness of Carmen to the bankruptcy estate.... [T]he law appears to be clear that a turnover proceeding is proper only where the specific property or the identifiable proceeds therefrom is in the possession of the respondent....

[T]he referee erred in asserting summary jurisdiction....

On remand, *the district judge will enter an order requiring the Referee to vacate the turnover order* and to dismiss in the bankruptcy proceeding in the Eastern District of Virginia, the claim against Carmen, but *without prejudice to the right of the Trustee to seek relief "in the proper jurisdiction in ancillary proceedings properly instituted." Matter of Penco Corp.,* 465 F.2d 693, 697 (4th Cir.1972) (emphasis added).

The simple truth is that the receiver in this case has mistaken the remedy. He and his attorneys have given great labor and attention to this case and are entitled to commendation for their efforts, and it is with regret that I find myself unable to confirm the referee's report, for Joseph ought to be legally liable for all the property which has disappeared.... There is no class of questions in bankruptcy which give rise to so much difficulty as these summary proceedings to compel the return of property or money to the trustee. It frequently happens that, while the evidence is such as to make it quite probable that the trustee is entitled to the property, an order cannot be made because of the want of certainty and conclusiveness in the proof. Attorneys for trustees should not bring such proceedings without having decisive evidence to support them. *In all cases of doubt, a plenary suit is the proper proceeding. Such a suit may still be brought in this case,* and any order made in this proceeding may provide that it is without prejudice to such a suit. *In re Gilroy & Bloomfield,* 140 F. 733, 737–38 (S.D.N.Y. 1905) (emphasis added).

When the need for present possession to support an order of turnover under the Bankruptcy Act is properly understood, within the context of the distinction between summary and plenary proceedings, it becomes clear that the trustee's inability to obtain turnover, due to the lack of present possession, cannot properly be equated with the total absence of liability to the estate on the part of the turnover respondent. Indeed, ultimate liability was often abundantly clear, it just could not be determined in a summary proceeding. *See In re Korin,* 25 F.Supp. 323, 324 (E.D.N.Y.1938) ("The referee was undoubtedly correct in stating: 'My position is the respondents are responsible for the

total amount they removed on the Monday in question.' Their responsibility, however, should be established in a plenary suit...."); *see also, In re America Dry Corp.,* 50 F.2d 625, 628 (E.D.N.Y.1931); *Gilroy & Bloomfield,* 140 F. at 737–738. Thus, the inability to obtain summary turnover merely required the trustee to resort to a civil action in a court of appropriate jurisdiction. It never absolved the party who was once in possession of property of the estate of all liability.

 Turnover proceedings under the current Bankruptcy Code are dramatically different from the summary proceedings of the same name under the old Act.

Under the old Bankruptcy Act, a bankruptcy court's summary jurisdiction over a debtor's property was limited to property in the debtor's possession when the liquidation petition was filed....

[T]he new Bankruptcy Code abolished the distinction between summary and plenary jurisdiction, thus, expanding the jurisdiction of the bankruptcy courts beyond the possession limitation. *Whiting Pools,* 462 U.S. at 206 n. 13, 103 S.Ct. at 2314 n. 13.

Beyond the abolition of the distinction between summary and plenary jurisdiction, turnover proceedings can no longer be characterized as "a judicial innovation." *Maggio,* 333 U.S. at 60–62, 68 S.Ct. at 404. They now have a statutory foundation, which delineates not only the elements of the trustee's burden of proof but also the remedies available to it. Present possession is no longer a prerequisite for liability. Instead, liability may be predicated upon possession "during the case," not just at the time the order is entered. Furthermore, the trustee is no longer limited to recovering specific property or its proceeds. Instead, the trustee is also given the ability to recover "the value of such property." Defendant's argument, which equates the absence of present possession with the absence of liability, would require the court to disregard the language of § 542(a) which makes the statute applicable to anyone who possessed property of the estate during the case and gives the trustee the ability to recover the value of such property. *See Robertson,* 105 B.R. at 456–58; *see*

*also, In re Burke,* 150 B.R. 660, 662–63 (Bankr.E.D.Tex.1993).

■ The presence of paragraph (c) in § 542 also undermines Carlton, Fields' argument that present possession is a prerequisite to the trustee's recovery. This portion of § 542 is essentially a codification of the Supreme Court's holding in *Marin.* See H.R.Rep. No. 595, 95th Cong., 1st Sess. 369, 377 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5963, 6325; S.Rep., No. 989, 95th Cong., 2d Sess. 84 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5870. Section § 542(c) gives an affirmative defense to a turnover defendant who, in good faith and without knowledge of the commencement of the case, transfers property of the estate to an entity other than the trustee. The legislative history indicates that this portion of the statute "protects [such] an entity...." *Id.* If the lack of present possession, regardless of cause, was a complete defense to turnover, one must naturally wonder what Congress was attempting to give protection from. Section 542(c) serves no purpose if the lack of present possession requires a judgment for the defendant. *See Robertson,* 105 B.R. at 458. Its presence in the statute leads to the natural implication that if, after receiving notice of the case, a party in possession of property of the estate transfers that property to an entity other than the trustee, it does so at its own peril. *In re Hoffman,* 51 B.R. 42, 46 (Bankr.W.D.Ark. 1985).

■ Proceedings under § 542 effectively combine both the summary and the plenary remedies a trustee was required to pursue under the old Act, thus, allowing the pursuit in a single proceeding of relief that previously may have required two separate proceedings. Consequently, if the turnover defendant is still in possession of property of the estate, the trustee may recover that property. If the defendant no longer has possession of property of the bankruptcy estate, the court may inquire into the propriety of its disposition and, if appropriate, enter a money judgment in favor of the trustee for the value of such property. In effect, turnover proceedings have become what the Supreme Court noted they were not under the old Bankruptcy Act. They are not only the means by which the trustee can recover specific property of the estate and its identifiable proceeds, but also the means by which it can recover "damages for tortious conduct such as embezzlement, misappropriation or *improvident dissipation of assets.*" *Maggio,* 333 U.S. at 63, 68 S.Ct. at 405 (emphasis added).

■ The requirements of § 542(a) are applicable to any entity that possessed property belonging to the debtor at any time during case pendency, whether or not it had possession at the time a demand for turnover was made. It means that such entity must account to the trustee for the property itself or be prepared to surrender its value if for some reason the property itself no longer exists. What this means in a Chapter 7 is that if an entity in possession of estate property receives notice of the bankruptcy filing but nonetheless transfers the property to anyone other than the trustee, it does so at its peril. In the absence of the property of itself, the trustee in such instance is entitled to recover the value of the estate property from the entity making the transfer. *Borchert,* 143 B.R. at 919.

The court concludes that a turnover defendant's lack of present possession of property of the bankruptcy estate or its proceeds is not a defense to a turnover action under the Bankruptcy Code. If the turnover defendant has improperly transferred property of the estate, so that neither the property nor its proceeds are in the defendant's possession, the trustee may recover a money judgment for the value of such property.

Carlton, Fields asserts what are essentially two affirmative defenses to the trustee's claim against it. The first attempts to cast the responsibility for the present state of affairs upon the trustee. Carlton, Fields contends that, had the trustee conducted his investigation of the Merrill Lynch account in a different fashion or with a greater degree of rapidity it could have been apprised of the trustee's claim to the funds in its trust account before it mailed them to Paul Davis on February 24.

[T]he court must reject the bank's conclusion that the trustee's breach of his obligations relieves it of any liability. Clearly

the Sections 704 and 542 create separate and distinct obligations.... The bank's duty to deliver the funds to the trustee, especially where as here it had knowledge of the bankruptcy, is absolute. The trustee's breach of duty is irrelevant to the bank's duty. *Bidlofsky*, 57 B.R. at 900 (citations omitted).

Because it had actual knowledge of the bankruptcy case, Carlton, Fields cannot take advantage of the statutory exception to turnover of § 542(c). Nonetheless, as a second defense to the action, it asks this court to do what the Supreme Court did in *Bank of Marin* and recognize an equitable exception to the otherwise absolute obligation imposed upon it by § 542(a). It argues "nothing put Carlton, Fields on any notice that these funds allegedly belonged to the debtor." Carlton, Fields *Post Trial Memorandum*, p. 16. Working from this premise, it asks the court to create an equitable exception to § 542(a) which would relieve an entity from its obligation to turn property over to the trustee, notwithstanding actual knowledge of the case, where it did not know the property in its possession belonged to the debtor.[7]

The court does not need to consider whether or not it should recognize an equitable defense to § 542(a) beyond those already created by Congress. The facts of this case do not warrant such a consideration, because the court does not accept Carlton, Fields' initial premise that nothing put it on notice that the money might belong to the debtor.

The only court to consider a similar argument did so in connection with proceedings to recover an unauthorized post petition transfer of property of the estate. In their defense, the defendants apparently argued that they did not know the property they received was property of the estate, as opposed to property of an officer of the bankrupt corporation. This defense was rejected out of hand. *Matter of Citizens Loan and Savings Co.*, 5 B.R. 510, 514 (Bankr.W.D.Mo. 1979), *aff'd*, 64 B.R. 537 (W.D.Mo.1981). In doing so, the court stated:

Nor is it necessary, as the defendants appear to argue, that the defendants have definite and specific knowledge that the monies transferred are those of the estate, as opposed to the corporate officer.... Rather, it is sufficient that the defendants, as the evidence shows, had knowledge of the petition in the bankruptcy case and of Richard H. Snook's position with the bankrupt. For the filing of a bankruptcy petition is not only "an attachment and an injunction", but also a "caveat to all the world", under which a person does business at his peril with the bankrupt or its officer. *Citizens Loan & Savings Co.*, 5 B.R. at 514 (citations omitted).

In a footnote the court continued:

Recipients of money paid them after bankruptcy by an officer of the bankrupt cannot be entitled to "close their eyes" without investigation of the possibility that the money may belong to the bankrupt. *Id.*, at n. 17.

Carlton, Fields had actual knowledge of the bankruptcy case and of Davis' position with the debtor. This alone seems to be sufficient to prevent it from claiming ignorance concerning the true ownership of the funds.

The court need not, however, base its decision only upon Carlton, Fields' admitted knowledge of the relationship between Davis and the debtor and the pendency of debtor's bankruptcy case. The court finds that as of February 24, 1993, the date it mailed the money to Davis, Carlton, Fields knew or should have known the following facts:

1. Carlton, Fields represented U.S.A. Diversified Products, Inc. and its officers, Paul and Candice Davis, prior to December 10, 1992.

2. U.S.A. Diversified Products, Inc. paid the initial retainer, which Carlton, Fields requested in connection with its representation of that corporation and its principals.

---

7. To a large extent, Carlton, Fields seems to justify its claimed belief that the property in its trust account belonged to Davis upon Davis' December 14, 1992 statement to Johnson that the money was his. It is undisputed, however, that this information never reached Jones, who was the attorney that authorized the disbursement of the funds and mailed them to Davis. Accordingly, the court finds that Jones did not and could not have taken any action premised upon this statement because he was never aware of it.

3. U.S.A. Diversified Products, Inc. filed a petition for relief under the Bankruptcy Code on December 10, 1992.

4. The day before U.S.A. Diversified's petition for relief, the sum of $125,000.00 was wire transferred into Carlton, Fields' trust account. The documents associated with this wire transfer did not disclose the ownership of the account from which the money came.

5. By virtue of counsel's letter of February 10, 1993, which Carlton, Fields received on February 22, 1993, it should have known that a trustee had been appointed in U.S.A. Diversified's bankruptcy case.

6. Debtor's address was 1001 W. Brooklyn, P.O. Box 505, Syracuse, Indiana 46567.

7. Carlton, Fields' engagement letter to the debtor and its billing address for the debtor was 1001 W. Brooklyn, Syracuse, Indiana 46567.

8. Carlton, Fields remitted the funds from the trust account to Davis at P.O. Box 745, Syracuse, Indiana 46567, an address which apparently had not been used for any previous communication.

Under these circumstances, Carlton, Fields cannot permissibly claim a lack of notice or knowledge that the funds in its trust account belonged to the debtor.

■■■ The means of knowledge are generally regarded as actual knowledge. *Potash Company of America v. International Minerals & Chemical Corp.*, 213 F.2d 153, 155 (10th Cir.1954); *Latta v. Western Investment Co.*, 173 F.2d 99, 106 (9th Cir.1949), *cert. denied*, 337 U.S. 940, 69 S.Ct. 1516, 93 L.Ed. 1744 (1949). "A person who has notice of facts which would cause a reasonably prudent person to inquire as to further facts is chargeable with notice of the further facts discoverable by proper inquiry." 66 C.J.S. *Notice* § 11(a) at 643 (1950); *see also, Radiology Center S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1222 (7th Cir.1990); *Sapp v. Warner*, 105 Fla. 245, 141 So. 124, 127 (1932), *aff'd*, 105 Fla. 245, 143 So. 648 (1932); *Symons v. State*, 490 So.2d 1322, 1324 (Fla.App. 1986); *Rafkind v. Beer*, 426 So.2d 1097, 1099 (Fla.App.1983). Carlton, Fields knew and had notice of sufficient facts that would have caused a reasonably prudent person to make a further inquiry as to whether the funds in its trust account belonged to the debtor or to

Davis before disbursing those funds to him on February 24, 1993. Such an investigation would have required an inquiry of the trustee and would have quickly led to the discovery of the trustee's claim to the money. Carlton, Fields did not, however, make such an investigation. It simply mailed the money to Davis. Under these circumstances, where a reasonably prudent person would have inquired further before disbursing more than $110,000.00 and where that inquiry would have resulted in Carlton, Fields learning of the trustee's claim to the money in its possession, Carlton, Fields cannot successfully contend that it had no notice that the money belonged to the estate.

■■■ The trustee also seeks prejudgment interest on the amount it recovers from Carlton, Fields. Prejudgment interest is not designed to punish a defendant for requiring a successful plaintiff to litigate its claim. *City of Milwaukee v. Cement Div. of Nat. Gypsum Co.*, —— U.S. ——, ——, 115 S.Ct. 2091, 2096, 132 L.Ed.2d 148 (1995). Instead, the essential rationale for awarding it is to compensate the prevailing party for the loss of the use of its money or property while it was in its opponent's possession. *Partington v. Broyhill Furniture Industries, Inc.*, 999 F.2d 269, 274 (7th Cir.1993).

■■■ Although no statute governs the award of prejudgment interest in federal courts, this "merely indicates that the question is governed by traditional judge-made principles." *City of Milwaukee*, —— U.S. at ——, 115 S.Ct. at 2094. Thus, the award of prejudgment interest is a matter committed to the court's discretion. *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 439 (7th Cir.1989) (Ripple, J., concurring) (*citing Myron v. Chicoine*, 678 F.2d 727, 734 (7th Cir.1982)). One of the most common standards used by the courts considering an award of prejudgment interest is whether the "... amount of the claim is either liquidated or reasonably ascertainable by reference to established market values" instead of by judicial fiat. *In re Industrial & Mun. Engineering, Inc.*, 127 B.R. 848, 851 (Bankr.C.D.Ill.1990) (*quoting In re First Software Corp.*, 107 B.R. 417, 425 (D.Mass. 1989) (quotations and citations omitted)).

Prejudgment interest accrues from the date of demand, *In re Cybermech, Inc.,* 13 F.3d 818, 822 (4th Cir.1994), or in the absence of demand, the date that the complaint was filed. *Industrial & Municipal,* 127 B.R. at 851.

█ The decision whether or not to award prejudgment interest is much less troublesome than determining the appropriate rate. The courts are not at all in agreement concerning the rate at which prejudgment interest should accrue. *See Gorenstein,* 874 F.2d at 437 (prime rate); *Transamerica Premier Ins. Co. v. Miller,* 41 F.3d 438, 445–46 (9th Cir.1994) (state prejudgment rate); *Dopp v. Pritzker,* 38 F.3d 1239, 1252 (1st. Cir.1994) (rate established by local rules); *In re Nucorp Energy, Inc.,* 902 F.2d 729, 734 (9th Cir.1990) (post-judgment rate designated by 28 U.S.C. § 1961). In the Seventh Circuit, however, unless the court engages in refined rate-setting, tailored specifically to the facts of the case, it "... should use the 'prime rate'—that is, the rate banks charge for short term unsecured loans to credit-worthy customers" during the litigation. *Matter of Oil Spill By The Amoco Cadiz Off the Coast of France on March 16, 1978,* 954 F.2d 1279, 1332 (7th Cir.1992), *see also, Gorenstein,* 874 F.2d at 436; *Partington,* 999 F.2d at 274.

There can be no question that the trustee's claim is a liquidated one, since it seeks to recover a specific and readily determinable amount of money. *See, Matter of Knight,* 55 F.3d 231, 235 (7th Cir.1995); *Matter of McGovern,* 122 B.R. 712, 715, 717–718 (Bankr. N.D.Ind.1989). Based upon the Federal Reserve Statistical Release, H. 15(519), dated June 1, 1993, on the date this action was commenced, May 28, 1993, the bank prime loan rate was 6%. The trustee is entitled to recover prejudgment interest at this rate from May 28, 1993 to the date of judgment.

█ Of the total $125,000.00 in question, the trustee has recovered the sum of $1,476.01 from the defendant Michigan National Bank. The parties agree that this amount should be credited against any judgment the trustee might recover from Carlton, Fields on account of the funds it remitted to Davis. As a result, the trustee is entitled to recover from Carlton, Fields the sum of $123,523.99, together with interest thereon at the rate of 6% per annum from May 28, 1993 to the date of judgment.

Judgment will be entered accordingly.