**In the Matter of USA DIVERSIFIED PRODUCTS, INC., Debtor.**

**R. David BOYER, Trustee, Plaintiff–Appellee,**

v.

**CARLTON, FIELDS, WARD, EMMANUEL, SMITH & CUTLER, P.A., Defendant–Appellant.**

No. 96–1900.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1996.

Decided Nov. 8, 1996.

Michael P. O'Hara, Thomas P. Yoder (argued), Barrett & McNagny, Fort Wayne, IN, Hywel Leonard, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, FL, for Defendant–Appellant.

Howard B. Sandler, Robert L. Nicholson (argued), Beckman, Lawson, Sandler, Snyder & Federoff, Fort Wayne, IN, for Plaintiff–Appellee.

R. D. Boyer, Helmke, Beams, Boyer & Wagner, Fort Wayne, IN, Trustee.

Before POSNER, Chief Judge, and WOOD, Jr., and ESCHBACH, Circuit Judges.

POSNER, Chief Judge.

This appeal by the defendant in an adversary proceeding brought by a trustee in bankruptcy requires us to interpret section 542 of the Bankruptcy Code. In September 1992, Carlton, Fields, a Florida law firm, was retained by Paul Davis, the owner of an

import-export company named USA Diversified Products, Inc., to represent Diversified, Davis, and his wife in a suit for fraud that had been brought against them in Florida. See *Hoseline, Inc. v. U.S.A. Diversified Products, Inc.*, 40 F.3d 1198 (11th Cir.1994). On December 9 Davis wired the law firm $125,000 to fund a possible settlement of the suit. The money came from Diversified's money-market account at Merrill Lynch. The following day, Diversified filed for bankruptcy under Chapter 11. Davis informed Carlton, Fields of the bankruptcy four days later but said that the $125,000 had come from his personal funds. In February of the following year, Davis directed the law firm to return the money to him, and it did so forthwith, after deducting $14,000 for attorney's fees owed it for its work in the Florida suit. Shortly afterward, the Chapter 11 proceeding was converted to Chapter 7, and a trustee was appointed. He demanded the return of the $125,000 from the law firm on the ground that it was property of the debtor's estate, and instituted this adversary proceeding when the demand was refused. The bankruptcy judge ruled in favor of the trustee after conducting an evidentiary hearing. 193 B.R. 868 (Bankr.N.D.Ind.1995). The district judge affirmed. 196 B.R. 801 (N.D.Ind. 1996).

One who during a bankruptcy proceeding is "in possession, custody, or control" of property belonging to the debtor's estate "shall deliver to the trustee, and account for, such property or the value of such property," 11 U.S.C. § 542(a), unless the possessor "has neither actual notice nor actual knowledge of the commencement of the [bankruptcy] case." § 542(c). The law firm argues that (1) the $125,000 that Davis wired to the law firm and later retrieved from it was not property of the estate; (2) the law firm never had possession, custody, or control of the money; (3) the firm cannot be required to return property that it no longer has; and (4) the firm has a nonstatutory equitable defense to section 542(a) based on its lack of knowledge that the $125,000 was the property of the debtor rather than Davis's own property. If any of these arguments fly, the law firm wins.

**1.** The first argument borders on the frivolous. The money transferred to the law firm came out of a money-market account of Diversified, the debtor to be. It is irrelevant that, as the law firm points out correctly on the authority of *Citizens Bank v. Strumpf,* —— U.S. ——, ——, 116 S.Ct. 286, 290, 133 L.Ed.2d 258 (1995), Diversified did not own the money in the account, but was merely a creditor of Merrill Lynch (a financial intermediary analogous to the bank in the *Strumpf* case). Property of the debtor is defined to include "all legal or equitable interests of the debtor," § 541(a)(1), and obviously that includes the interest that a depositor has in the money in his account, more precisely the money owed him by the bank by virtue of the account. *Sousa v. Bank of Newport,* 170 B.R. 492, 494 (D.R.I.1994); *In re Hammon,* 180 B.R. 220, 222 (9th Cir. BAP 1995); 4 *Collier on Bankruptcy* para. 541.11 (Lawrence P. King ed., 15th ed. 1996). The law firm contends in the alternative that Davis stole the money from Diversified when he wired it to the law firm, so that it no longer belonged to Diversified the following day, when Diversified became a debtor in bankruptcy. There is no evidence Davis stole it. Remember that Diversified along with Davis and his wife was a defendant in the Florida lawsuit, so that the application of money of Diversified to the defense of the suit was not, on its face anyway, a misapplication. The theft, moreover, if that is what it was, would not have divested Diversified of its claim to the $125,000. Only the nature of the claim would have changed. Instead of being a claim against the law firm, it would have been a claim against the thief. The law firm would have been holding the proceeds of the theft—an asset of Diversified, *Stoumbos v. Kilimnik,* 988 F.2d 949, 956–57 (9th Cir. 1993)—as constructive trustee. E.g., *Corporation of the President of the Church of Jesus Christ of Latter–Day Saints v. Jolley,* 24 Utah 2d 187, 467 P.2d 984, 985 (1970); cf. *Scholes v. Lehmann,* 56 F.3d 750, 759 (7th Cir.1995).

**2.** The law firm had control of the $125,000 during the bankruptcy proceeding. We know this because it exercised control by deducting the attorney's fee that was owed it

before remitting the money to Davis. Against this conclusion the firm cites *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 892–94 (7th Cir. 1988), which holds that a bank that receives a check for deposit is not a transferee for purposes of the fraudulent-conveyance provision of the Bankruptcy Code, 11 U.S.C. § 550(a). *Bonded* defines a transferee as one who has "the right to put the money to one's own purposes." 838 F.2d at 893. The law firm clearly was that with respect to the $14,000 in attorney's fees that it deducted from Davis's money, but not with respect to the remainder of the $125,000. So what? Section 542 is not about the obligations of transferees. It is about the obligations of persons who possess, control, or have custody, and these are normally persons who do *not* have "the right to put the money to [their] own purposes." A transferee claims an entitlement to the money; entities targeted by section 542 do not. The purpose of the section is to empower the trustee in bankruptcy to get hold of the property of the debtor, some of which will be in the possession, custody, or control of third parties. The $125,000 was property of Diversified in the custody of the law firm.

■ 3. But by the time the trustee got around to demanding the money from the law firm, the law firm no longer had it, so how could it deliver it to the trustee? The statute, however, requires the delivery of the property *or the value of* the property. Otherwise, upon receiving a demand from the trustee, the possessor of property of the debtor could thwart the demand simply by transferring the property to someone else. That is not what the statute says, *In re Gailey, Inc.,* 119 B.R. 504, 514 (Bankr. W.D.Pa.1990), and can't be what it means. See *May v. Henderson,* 268 U.S. 111, 119, 45 S.Ct. 456, 460, 69 L.Ed. 870 (1925); *In re Borchert,* 143 B.R. 917, 919 (Bankr. D.N.Dak.1992).

■ 4. Some cases, it is true, illustrated by *In re DeBerry,* 59 B.R. 891, 896 (Bankr. E.D.N.Y.1986), say or imply that the transferor has to have violated a fiduciary obligation, or have acted in bad faith, in order to be held liable to the trustee for the value of

the property that he should have turned over but no longer possesses. These statements echo the regime, one of equitable discretion well illustrated by the Supreme Court's decision in the *May* case, that preceded the statute, which in subsection (c) provides an escape hatch for possessors who neither know nor have "actual notice" (that is, knowledge of facts that would lead a reasonable person to inquire further, *Shacket v. Philko Aviation, Inc.,* 841 F.2d 166, 170 (7th Cir. 1988); *Contract Courier Services, Inc. v. Research & Special Programs Administration,* 924 F.2d 112, 114 (7th Cir.1991)) that a bankruptcy proceeding has been commenced. The law firm did know. But it argues, and the trustee surprisingly does not bother to deny, that besides the statutory defense there is an equitable defense for possessors who know about the bankruptcy but don't know that the property of which they are in possession is property of the debtor in the bankruptcy proceeding. The statements in cases like *DeBerry* lend color to this argument. But nothing more. They are, as we said, the echoes of the pre-statutory regime. The statute supplanted the equitable concepts used to protect the innocent transferor. Given the statute, there is no ground or reason for multiplying defenses as suggested by the law firm and acquiesced in by the trustee. All that is needed is a sensible interpretation of subsection (c).

■ If we are right that subsection (a) imposes on the possessor a legal duty to deliver up the value of the property that he possessed even if he no longer possesses it, the draftsmen could not have intended that knowledge of the bankruptcy alone would trigger the duty. (Maybe the bankruptcy had been widely publicized, so that everyone in the financial and legal community knew about it.) For then persons connected with a bankrupt would become financial lepers, unable to engage in any transaction because anyone dealing with them would fear that they were spending money actually belonging to the debtor. On a literal reading of subsection (c), if a bank knows that $X$ has declared bankruptcy, and $Y$ deposits in the bank and later withdraws from it $1 million that in fact belongs to $X$, though the bank neither knew

nor had reason to know this, the statute makes the bank liable to $X$'s trustee for $1 million. This cannot have been intended. We cannot find a case on the question—maybe the answer is too obvious—but the draftsmen must have intended, and we hold that subsection (c) means, that the relevant knowledge or notice is knowledge or notice to a possessor of property that a bankruptcy proceeding had begun *and* that the property in the possessor's custody was property of a debtor in that bankruptcy proceeding.

If Carlton, Fields did not know that the $125,000 belonged to Diversified, which it knew to be in bankruptcy, at least it knew enough to place a reasonable person on notice, requiring the firm to conduct a reasonable inquiry to determine whose property the $125,000 was. For it had received the money from Diversified's owner for use in defending Diversified, along with Diversified's owner and the owner's wife, against a lawsuit. It was more likely that Diversified was advancing the money to defend all three and to pay a settlement terminating their liability than that the corporation's owner was putting up his own money to defend a corporation about to declare bankruptcy (and the law firm knew that the bankruptcy had followed immediately upon the wire transfer). More likely, not certain, because Diversified's assets may already have been depleted to the point where the only real exposure was that of the other defendants. And it is true that when Davis told the firm about the bankruptcy, one of the firm's lawyers asked him whose money it was holding and Davis said it was his. But remember that the test is notice of circumstances that would cause a reasonable person to inquire further. Knowing that the corporation was bankrupt, and given Davis's obvious incentive to recharacterize corporate assets as his own, the firm should not have been satisfied with Davis's oral assurance. The firm argues that actual knowledge (indeed, "affirmative and unequivocal knowledge") should be required for liability, but the statute, as we have emphasized, is contrary—and rightly so, for otherwise the opportunities for dissipating a corporation's assets on the eve of bankruptcy would be rich. The trustee is entitled to the $125,000 from the law firm, as

the bankruptcy judge and the district judge held.

AFFIRMED.