**In the Matter of ALOFS MANUFACTURING COMPANY, Debtor.**

**In the Matter of TARGET COMPONENTS, INC., Debtor.**

**ALOFS MANUFACTURING COMPANY and Target Components, Inc., Plaintiffs,**

**v.**

**TOYOTA MANUFACTURING, KENTUCKY, INC., Wolverine Tool & Engineering, Hi–Tech Tool & Die, Precise Tool Engineering, S.O.S. Engineering, Die–Tool Engineering, Diematic Tool & Die, and Comerica Bank, Defendants,**

**and**

**Old Kent Bank, Intervenor.**

**Bankruptcy Nos. 96–87690, 96–87691. Adversary No. 96–8356.**

United States Bankruptcy Court, W.D. Michigan.

April 1, 1997.

---

**4.** *See* Transcript of 8/28/95 hearing page 18, lines 15–25, page 19, lines 3–4.

84

Robert S. Hertzberg, Bloomfield Hills, MI, for Debtors.

Ralph E. McDowell, Detroit, MI, for Comerica Bank.

Donald Visser, Grandville, MI, for Hi–Tech Tool & Die.

Patrick E. Mears, Grand Rapids, MI, for Old Kent Bank & Trust Co.

## MEMORANDUM OPINION REGARDING HI–TECH'S MOTION TO RECONSIDER

JAMES D. GREGG, Bankruptcy Judge.

### I. PROCEDURAL BACKGROUND

This matter is before the court on the motion of Hi–Tech Tool & Die ("Hi–Tech") for reconsideration of this court's order entered on November 29, 1996 ordering the turnover of property to Alofs Manufacturing Company ("Alofs") and Target Components, Inc. ("Target") (collectively the "Debtors"). This court issued its oral bench opinion during the midst of the Thanksgiving holiday weekend following a two-day trial conducted on November 26 and 27, 1996. The expedited proceeding involved a matter of great urgency to the parties which required a prompt decision by this court, i.e., the right to ownership of certain tool and die equipment ("the Tools" or "Tooling") promptly needed by Debtors and their customers to be used for the manufacture of automobile parts. In its oral bench opinion on November 29, this court ruled that the Tools that were currently in possession of Hi–Tech were property of the Debtors' estates and were thus subject to immediate turnover to the Debtors. This court also ruled that other tools that were in possession of Wolverine Tool & Engineering ("Wolverine") were not property of the estate and were not subject to turnover.[1] In order to protect the rights of all the interested parties, this court fur-

---

1. In a separate order dated November 29, 1996, this court ordered Wolverine to turnover tooling upon receipt of full contractual payment by Debtors. Debtor, have not contested this court's ruling in favor of Wolverine and subsequently agreed to an order of partial dismissal by which the claims against Wolverine was dismissed with prejudice. *See* Agreed Order of Partial Dismissal (1/7/97). Accordingly, the portion of this court's ruling of November 29, 1996 and the separate order that relates to Wolverine is not at issue in this motion for reconsideration.

ther ordered that the amount of $532,000 be held in escrow pending the ultimate resolution of the rights and interests of the respective parties to the sale proceeds.[2]

On December 9, 1996, Hi–Tech filed a Motion for Reconsideration and/or New Trial. On December 12, 1996, Hi–Tech's lender, Old Kent Bank ("OKB") filed a Motion to Intervene in the proceedings in order to protect an alleged lien interest in the proceeds currently held in escrow.[3] On December 31, 1996, a hearing was held before this court regarding Hi–Tech's motion for reconsideration and/or new trial. In addition to considering the written briefs, this court heard arguments from attorneys for Hi–Tech, OKB, Debtors, and Debtors' bank, Comerica Bank. For the reasons stated on the record, this court decided that there were not sufficient grounds to reopen proofs or grant a new trial.[4] However, this court granted the motion to reconsider on a limited basis and invited the parties to submit written briefs. *See* Order Denying Motion to Reopen Proofs, Denying Motion for New Trial and Partially Granting Motion for Limited Reconsideration (12/31/96).

In accordance with this court's order, on January 10, 1997, Hi–Tech filed another legal memorandum in support of its prior motion for reconsideration. On January 13, 1997, OKB also filed a legal memorandum in support of Hi–Tech's motion for reconsideration.

On January 21, 1997, Debtors filed their legal memorandum in Opposition to Hi–Tech's motion for reconsideration. Hi–Tech filed a reply brief on January 29 and Debtors filed their reply brief on February 18. In addition to reviewing all of the post-trial briefs submitted by the parties, this court has also reviewed the transcripts of the hearings conducted on November 26 and 27, 1996, as well as the exhibits that were submitted into evidence during the trial. This court has not considered any purported "evidence" presented by the parties following the close of proofs at the conclusion of trial on November 27, 1996.

This court has jurisdiction over this adversary proceeding. 28 U.S.C. § 1334. This matter is a core proceeding under section 157(b)(2)(E) because it involves a request to turnover property of the estate. 28 U.S.C. § 157(b)(2)(E). The following constitutes this court's findings of fact and conclusions of law upon reconsideration. Fed. R. Bankr. Pro. 7052 and 9024.

## II. FACTUAL BACKGROUND

On November 19, 1996, Debtors filed this adversary proceeding against several of its customers and suppliers including Hi–Tech. The Debtors also filed an emergency motion for turnover of tooling and payment of a receivable. Count I of the complaint re-

---

2. The court's oral bench opinion was summarized in a separate order requiring Hi–Tech to deliver the tooling upon payment of the funds into escrow. See Order Granting in Part and Denying in Part Amended Motion for Turnover of Tooling by Hi–Tech Tool & Die (11/29/96).

3. Without objection by any party, Old Kent Bank was permitted to intervene at a subsequent hearing.

4. In denying Hi–Tech's motion for a new trial, this court reiterated its prior conclusion that there was no express bailment between Hi–Tech and Debtors. See Bench Opinion (1 2/31/96), Transcript, p. 8. In support of its Motion for Reconsideration and/or New Trial, Hi–Tech submitted an affidavit from one of the Debtors' former employees, Doug Shantz, who had been called as a witness by Wolverine at trial. In his affidavit, Mr Shantz stated that he had agreed with Hi–Tech that the tools would be "temporarily loaned" to the Debtors for test runs and then returned to Hi–Tech. See Amended Brief in Sup-

port of Motion for Reconsideration and/or New Trial, Exhibit A (Affidavit of Doug Shantz). However in an oral bench opinion, this court concluded that Hi–Tech had failed to satisfy the requirements for a new trial under Rule 59 of the Federal Rules of Civil Procedure as incorporated into Federal Rule of Bankruptcy Procedure 9023; namely, Hi–Tech failed to show that Mr. Shantz's testimony was "newly discovered evidence" which could not have been discovered with reasonable diligence prior to trial. See Bench Opinion (12/31/96), Transcript, p. 13. Indeed, Mr. Shantz appeared and testified at trial on behalf of Wolverine after Hi–Tech had rested its case Hi Tech attorney was not permitted to cross-examine Mr Shantz because his testimony was limited to Wolverine. Hi–Tech's attorney did not move to reopen proofs prior to the conclusion of trial, and this court has already determined that it would be inappropriate to reopen proofs under Rule 59. Accordingly, the affidavit of Doug Shantz will not be considered by this court for purposes of deciding the pending motion to reconsider.

quested the turnover of certain tools that were in the possession of various suppliers including Hi–Tech. Count II requested the turnover of monies that were allegedly owed by one of the Debtors' customers, i.e., Toyota Manufacturing, Kentucky, Inc. ("Toyota"). Count III concerned the entitlement to the proceeds of the funds allegedly due from Toyota. See Debtors' Complaint (11/19/96).[5]

### A. Summary of Evidence Presented at Trial

This court granted the Debtors' motion to shorten time and trial was held on November 26 and 27, 1996. Numerous witnesses testified during the trial.[6] In the oral bench opinion of November 29, 1 996, this court found that each of the witnesses who testified was credible and worthy of belief. See Bench Opinion Transcript, Vol.3, p. 9. Upon reconsideration this court remains convinced that the witnesses were basically truthful. However, careful review of the trial transcript reveals substantial confusion and several inconsistencies concerning the important issue of delivery of the Tools from Hi–Tech to Alofs or Target. Some of the confusion is no doubt attributable to the emergency nature of the hearings which required that the witnesses testify with little or no preparation and without the benefit of discovery. Nevertheless, the basic gist of the testimony was consistent and is summarized below.

Hi–Tech manufactured the Tooling for sale to Alofs or Target which in turn resold the Tooling to Toyota. When the Tooling was nearly complete, it was delivered by Hi–Tech to Target and/or Alofs for testing which consisted of running sample parts. In some cases, the Hi–Tech Tooling was shipped to a facility in Flint, Michigan for testing. After the sample runs were completed, the Tooling was returned to Hi–Tech for completion or what Debtors' counsel referred to as "tweaking." This final work consisted of applying a protective coating to the Tools and installing sensors. After the Tooling had been returned to Hi–Tech, Debtors filed their separate chapter 11 petitions. Thereafter, Debtors' counsel brought the emergency motion for turnover of the Tooling on the grounds that title to the Tooling had passed to the Debtors and therefore constituted property of the estates. Moreover, Debtors' customer, Toyota, was in desperate need of the Tooling and was refusing to make payments that were urgently needed by Debtors Likewise, Hi–Tech also encountered financial difficulties and was considering bankruptcy relief unless it received payment for the Tooling in its possession. Hence, the emergency nature of the hearing.

### B. Specific Tooling at Issue

The basic issue at trial was whether title to the Tooling had passed from Hi–Tech to the Debtors at the time the Tooling was delivered for testing. If so, then the Tooling would be property of the estate, the Debtors would be entitled to turnover under section 542 of the Bankruptcy Code, and Hi–Tech would be left with an unsecured claim for the unpaid balance owed on the Tooling. Conversely, if the Tooling was not property of the Debtors' estates, then one, or both, of the Debtors would be required to assume the executory contracts and pay the entire balance due in order to obtain possession of the Tooling.

---

**5.** Except for the disputes with Wolverine and Hi–Tech. all other issues were settled in advance of. or at, the trial.

**6.** This court heard testimony from: (1) David Kuczera, Chief Financial Officer for the Debtors; (2) Michael Cole, Senior Tool Engineer for the Debtors; (3) Steven Olmstead, who is a partner in the financial consulting firm of Conway MacKenzie & Dunlevy; (4) Richard E. Nelson who was employed the Debtors to serve as Program Manager for the Toyota account; (5) Calvin J. DeGood, President of Hi–Tech; (6) Paul Bogardus. Secretary–Treasurer of Hi–Tech; (7) Steven Frodl who is a die-maker for Wolverine; (8) Michael D Fish, Secretary Treasurer of Wolverine; (9) William C Fish, President of Wolverine, and (10) Douglas Shantz, a former engineering employee of Alofs.

In addition to the testimony, the court also considered the following exhibits that were admitted at trial, Plaintiffs' Exhibits 1–8; Hi–Tech's Exhibits A–Q; and Wolverine's Exhibits A–1, B–2, C–3, D–4, E–5, and F–6. The majority of the documentary exhibits consisted of quotations, purchase orders, and invoices relating to the tooling purchased by Debtors from Hi–Tech and Wolverine.

In their emergency motion, Debtors identified six tools that were in the possession of Hi–Tech in which Debtors claimed an ownership interest. These tools were identified by part number and described in a summary exhibit prepared by Debtors as follows: 57831; 57832/35; 57833/36; 63175/76; 74404(74481); and 57841/42. *See* Plaintiffs' Exhibit 4. According to Debtors' summary exhibit, Debtors still owed a total of $532,000 in unpaid invoices for the Tooling.

Debtors claimed that they had already paid for one of the tools (631 75/76) and therefore, were entitled to immediate turnover. Hi–Tech conceded that Debtors have paid nearly the entire purchase price for this tool and thus, are entitled to possession. *See* Hi–Tech's Motion for Reconsideration and/or New Trial (12/9/96), p. 3; Hi–Tech's Amended Motion for Reconsideration and/or New Trial (12/13/96), p. 2. *See also* Hi–Tech Machine & Tool, Inc.'s Brief in Support of Reconsideration (1/10/97), p. 3. None of the parties discussed this tool 63175/76 in their post-hearing briefs.

Conversely, Debtors conceded at trial that Tool number 74404(74481) (a/k/a "the Battery Clamp" tooling) had never been delivered by Hi–Tech for testing, and thus, Debtors did not have any basis for asserting the battery clamp tooling was property of the estate. *See, e.g.,* Testimony of Michael Cole, Transcript Vol. 1, pp. 103, 112. With respect to Hi–Tech, this court found that Tool Number 74404 (a/k/a the Battery Clamp Tooling) was never delivered to either of the Debtors based upon the uncontradicted testimony of the Debtors' representative, Mr. Cole *See* Bench Opinion, Transcript Vol.3, p. 17. Because this tool was never "shipped or delivered" title could not pass to Debtors under section 2401 of the Michigan Commercial Code. Therefore, the Battery Clamp Tooling was not property of either of the estates and was not subject to turnover. Debtors have not contested this finding and the Battery Clamp Tooling is not at issue upon reconsideration. See attached summary.

Accordingly, this court will not reconsider its ruling with respect to Hi–Tech Tool Numbers 63175/76 and 74404(74481). Instead, this court's reconsideration will be limited to the issue of "property of the estate" regarding the following four Hi–Tech Tool Numbers: 57831; 57832/35; 57833/36; and 57841/42. See attached summary.

## C. *Testimony of Key Witnesses*

Four of the witnesses who appeared at trial provided testimony that was particularly relevant to the dispute between Hi–Tech and Debtors.

### 1. *Michael Cole*

The Debtors' second witness, Michael Cole, had worked for five years as Senior Tool Engineer for both Alofs and Target and was familiar with the tools built by Hi–Tech. On the first day of trial, Mr. Cole testified that, with the exception of tool number 74404, the tools were delivered by Hi–Tech to Target, and then sent by common carrier to a stamping company in Flint called "ITS" where the tools were tested by stamping sample parts for Toyota. *See* Testimony of Michael C, Transcript Vol. 1, pp. 103–104 Later in his testimony, Mr. Cole corrected himself and testified that only three of the Hi–Tech tools were sent to ITS for test runs (57841/42; 57833/36; and 57832/35). *Id.* at Vol.1, pp. 105–107, 117, 123 In response to questioning from the court, Mr. Cole testified that only these three tools had been in the possession of either Alots or Target. *Id.* at Vol.1, pp. 111–12. Mr. Cole stated that after the test runs at ITS were completed, the tools were returned to Target, and then sent to Hi–Tech for completion which consisted of applying a protective coating and installing sensors. *Id.* at Vol.1, pp. 105,108. On the second day of trial, Mr. Cole again contradicted himself and said that only two of the Hi–Tech dies were sent to ITS for testing (57832/35 and 57833/36). *Id.* at Vol.2, pp. 13, 33.

Mr. Cole also testified with respect to the issue of whether the Tooling was "complete" at the time it was delivered for testing by Hi–Tech. In response to a series of leading questions on cross-examination, Mr. Cole acknowledged that at the time he received the Tooling for testing, they were not "complete," that they were not a "final product." *Id.* at Vol. 1, p. 122. Mr. Cole also conceded that the Debtors' possession was merely for

the "temporary purpose of obtaining some sample parts. . . . ." *Id.* at Vol. 1, p. 122. Most importantly, Mr. Cole stated that he "didn't intend to accept the dies when [he] received them [to] fully comply with the purchase orders." *Id.* at Vol. 1, p. 123. On the second day of trial, Mr. Cole attempted to clarify his prior testimony by explaining that the Tooling was complete at the time of they were tested in the sense that they were capable of stamping parts. *Id.* at Vol. 2, p. 34–35. However, they "didn't have coating on 'em and they didn't have sensors on 'em." *Id.* at Vol.2, p. 35.

### 2. *Richard Nelson*

As part of their case in chief, the Debtors also called Richard E. Nelson to testify concerning his involvement as program manager for the Toyota account for both Alofs and Target. Mr. Nelson testified that Tool numbers 57831 and 63175/76 were shipped by Hi–Tech to Target which in turn sent it to Alofs for a test run. Testimony of Richard Nelson, Transcript Vol.2, p. 55–56, 58–62. Thus, Mr. Nelson's testimony flatly contradicted that of Mr. Cole who had repeatedly testified that these Tools had never been in the possession of Target or Alofs. *See* Testimony of Michael Cole, Transcript Vol.1, pp. 111–12, 125. Mr. Nelson agreed with Mr. Cole that the Tooling was "complete" at the time of testing because it was capable of running parts. Testimony of Richard Nelson, Transcript Vol.2, p. 57 Mr. Nelson also agreed that the only additional work that remained after testing was the application of coating and sensors by Hi–Tech. *Id.* Because Mr. Cole was more directly involved in the relationship between the Debtors and Hi–Tech, to the extent their testimony conflicts, the court gives greater weight to Mr. Cole's testimony.

### 3. *Calvin DeGood*

Following the close of Plaintiffs' proofs. Hi–Tech presented testimony from two of its principal corporate officers. Calvin J. DeGood, president of Hi–Tech, testified that Tool numbers 57832/35 and 57833/36 were "drop shipped" at Target to go to ITS in Flint for testing. Testimony of Calvin DeGood, Transcript Vol.2, p. 104–105, 115. In this respect, Mr. DeGood's testimony was consistent with that of Mr. Cole. Mr. DeGood further testified that Tool number 57831 was delivered to Alofs for testing. *Id.* Testimony of Calvin DeGood, Transcript Vol.2, p. 104–105, 116–17. This contradicts Mr. Cole who said that this Tool was never delivered and partially contradicts Mr. Nelson who said that 57831 was first delivered to Target before it was sent to Alofs for testing. Mr. DeGood further testified that at the time of testing, the Tooling was not complete because it still had to be returned to Hi–Tech for the application of a protective coating and the installation of sensors. Testimony of Calvin DeGood, Transcript Vol.2, p. 1 10. The witnesses differed as to whether the Tooling was "complete" at the time of testing; however, all of them agreed that the Tooling was capable of producing parts, but still had to be returned to Hi–Tech for coating and sensors.

### 4. *Paul Bogardus*

Paul Bogardus, III, secretary-treasurer of Hi–Tech, also testified that some the Tooling was delivered to Target and then shipped to Flint for testing. Testimony of Paul Bogardus, Transcript Vol.2, p 143. Mr. Bogardus further testified that he had discussed with Mr. Cole and that testing was a "temporary situation" and that the Tooling would be returned to Hi Tech upon completion the testing. *Id.* However, Mr. Bogardus did not specify exactly which Tools were delivered to Target for testing. On cross-examination, Mr. Bogardus agreed that with the possible exception of Tool Number 63175/76, all of the Hi–Tech Tools were delivered to Alofs or Target. Testimony of Paul Bogardus, Transcript Vol.2, p. 152. Like the other witnesses, Mr. Bogardus testified that the Tooling was essentially complete, except for the coating and sensors. Testimony of Paul Bogardus, Transcript Vol.2, p. 149–50.

### III. ANALYSIS

In order to properly decide the Debtors' Motion for Turnover, this court must consider both federal bankruptcy law and Michigan commercial law.

#### A. *Federal Bankruptcy Law*

##### 1. *Burden of Proof*

It is well established that the burden of proof is on the party seeking turnover of

property of the estate; however, the applicable standard of proof is subject to debate. In its brief in support of the Hi–Tech's Motion for Reconsideration, Old Kent Bank suggests that the burden of proof must be sustained by clear and convincing evidence. *See Yoppolo v. Fifth Third Bank of NW Ohio (In re Bostic)*, 171 B.R. 270, 274 (Bankr. N.D.Ohio 1994) (citing *In re Bloom*, 91 B.R. 445 (Bankr.N.D.Ohio 1988)) The clear and convincing standard is based on a pair of older Supreme Court cases that were decided before the enactment of the current Bankruptcy Code in 1978. *See Maggio v. Zeitz*, 333 U.S. 56, 64, 68 S.Ct. 401, 405–06, 92 L.Ed. 476 (1948); *Oriel v. Russell*, 278 U.S. 358, 362, 49 S.Ct. 173, 174, 73 L.Ed. 419 (1929). The Code itself is silent with respect to the burdens of proof in a turnover action under section 542(a); and, in the absence of any direct statutory authority, several courts have continued to rely on these pre-Code Supreme Court cases. *See, e.g., Evans v. Robbins*, 897 F.2d 966, 968 (8th Cir.1990) ("As part of a prima facie case, the trustee must demonstrate by clear and convincing evidence that the assets in question are part of the bankrupt's estate."); *Mather v. Tailored Fabrics, Inc. (In re Himes)*, 179 B.R. 279, 282 (Bankr.E.D.Okla.1995) ("As part of that prima facie case, the Trustee must demonstrate by clear and convincing evidence that the assets In question are part of the bankrupt's estate."); *Groupe v. Hill (In re Hill)*, 156 B.R. 998, 1006 (Bankr.N.D.Ill.1993) ("The burden is upon the party seeking turnover [and that] burden must be carried by clear and convincing evidence."); *Express America, Inc. v. Sivley (In re Express America, Inc.)*, 130 B.R. 196, 198 (Bankr.W.D.Pa. 1991) ("As part of its prima facie case, debtor must show, by clear and convincing evidence, that the property at issue is part of the bankruptcy estate."); *Redfield v. Peat, Marwick, Mitchell and Co. (In re Robertson)*, 115 B.R. 613, 620 (Bankr.N.D.Ill.1990) ("This court perceives no reason why the Supreme Court's statement as to Trustee's burden of proof in Maggio should not govern following the codification of a Trustee's turnover authority in 11 U.S.C. § 542.").

In contrast, a growing minority of cases have concluded that the older pre Code Su-

preme Court cases have been superseded by the Code and are no longer consistent with more recent Supreme Court pronouncements on the appropriate burden of proof in other types of bankruptcy proceedings. For instance, the United States Bankruptcy Court for the Northern District of Ohio has recently applied the preponderance of evidence standard in turnover action under section 542. *Hunter v. Patton (In re Patton)*, 200 B.R. 172, 174–75 (Bankr.N.D.Ohio 1996). In so holding, the court relied on the Supreme Court's ruling in *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) wherein the Court ruled that the preponderance of evidence standard was more appropriate in a nondishargeability action under section 523(a) rather than the clear and convincing standard which is often applied in common law fraud cases. In *Grogan*, the Supreme Court stated, "Because the preponderance of the evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants, unless 'particularly important individual interests or rights are at stake.'" *Id.* The bankruptcy court found this reason equally applicable in the context of a section 542 turnover action and distinguished the Supreme Court's prior ruling in *Oriel v. Russell*, which was decided under the old Bankruptcy Act. *See Hunter v. Patton (In re Patton)*, 200 B.R. at 175. *See also, Hunter v. United States (In re Burkholder)*, 177 B.R. 260, 262 (Bankr.N.D.Ohio 1995) (applying preponderance standard and citing *Grogan* )

In a case arising in the Northern District of Indiana, both the bankruptcy court and the district court have opined in dicta that courts should apply the preponderance standard in turnover actions. *See Boyer v. Davis (In re U.S.A Diversified Products, Inc.)*, 193 B.R. 868, 872, n. 3 (Bankr.N.D.Ind.1995); *Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. v. Boyer (In re U.S.A. Diversified Products, Inc.)*, 196 B.R. 801, 805, n. 2 (N.D.Ind.1996), *aff'd*, 100 F.3d 53 (7th Cir. 1996). In that case, the parties stipulated that the trustee must carry the burden of proof by clear and convincing evidence, and

the bankruptcy court applied that standard at trial in ruling in favor of the trustee However, in a lengthy footnote, the bankruptcy court analyzed the relevant Supreme Court authority and concluded, "it is doubtful that the need to prove turnover by clear and convincing evidence, as required by *Oriel*, survived the enactment of § 542." 193 B.R. at 872, n. 3. Likewise, in affirming the bankruptcy court's ruling, the district court also expressed doubts regarding the continued viability of the clear and convincing evidence standard. 196 B.R. at 805, n. 2. The district court's opinion was also affirmed on appeal, however, the Seventh Circuit did not address the burden of proof issue. *See generally* 100 F.3d 53.

■ At the hearing on the motion for turnover, this court held that the burden of proof was on the Debtors as the parties seeking turnover. Transcript, Vol.3, p. 12 13 (citing *Williams v. American Bank of Mid-Cities, N.A. (In re Williams)*, 61 B.R. 567, 570 (Bankr.N.D.Tex.1986)). No one argued for the application of a clear and convincing evidence standard and it was tacitly assumed that the Debtors had to carry their burden by a preponderance. Upon reconsideration, it now appears that a majority of the courts have continued to follow the pre-Code Supreme Court cases that apply the clear and convincing standard in turnover cases. However this issue has not been addressed by the Sixth Circuit or any of the federal courts within the Western District of Michigan. In the absence of any recent controlling authority, this court is inclined to adopt the preponderance of evidence standard which is generally used in civil actions between private litigants and is consistent with more recent Supreme Court precedents. *Cf. Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389–90, 103 S.Ct. 683, 691–92, 74 L.Ed.2d 548 (1983). Accordingly, upon reconsideration, Debtors must prove each of the elements of their turnover action under section 542 by a preponderance of the evidence contained in the record.

### 2. *Elements of a Turnover Action*

■ The Debtors filed their emergency motion for turnover pursuant to section 542 of the Code which provides as follows:

**11 USC § 542. Turnover of property to the estate**

"(a) Except as provided in subsection (c) or (d) of this section, *an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title*, or that the debtor may exempt under section 522 of this titles, *shall deliver to the trustee*, and account for, such property or the value of such property, *unless such property is of inconsequential value or benefit to the estate*."

11 U.S.C. § 542(a) (emphasis added). A debtor in possession in chapter 11 has the rights, powers and duties of a trustee in bankruptcy. *See* 11 U.S.C. § 1107 Thus, in order to prevail in a turnover action the debtors in possession, Alofs and Target, must prove the following elements under section 542(a): (1) the property in the possession, custody, or control of an entity, (2) the property can be used in accordance with 11 U.S.C. § 363; and (3) the property has more than inconsequential value or benefit to the estate. *See In re Matheney*, 138 B.R. 541 548 (Bankr.S.D.Ohio 1992). *See also In re Radden*, 35 B.R. 821, 826 (Bankr.E.D.Va. 1983).

Of these three elements, there was no dispute that Hi–Tech was in possession of the Tooling and that the Tooling was of substantial monetary value and would be a considerable benefit to the Debtors' estates. See Plaintiffs' Exhibit 4. Thus, the first and third elements of a turnover action under 542(a) were clearly satisfied.

Therefore, the critical issue was the second element, i.e., whether the property was subject to use sale or lease under section 363 of the Bankruptcy Code. Section 363(b)(1) provides as follows, "The trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, *property of the estate*." *See* 11 U.S.C. § 363(b) (emphasis added). Reading the statutes together, the ultimate issue is whether the

Debtors can prove that the Tooling was property of one, or both, of the estates, and hence, subject to turnover.

### 3. *Property of the Estate*

■ Property of the estate is defined under section 541 of the Code which provides in part:

**11 USC § 541. Property of the estate**

(a) The commencement of a case under section 3401, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, *all legal or equitable interests of the debtor in property as of the commencement of the case.*

11 U.S.C. § 541(a)(1) (emphasis added). The debtor has the initial burden of proving that the property in issue is property of one, or both, of the estate under section 541. *See Williams v. American Bank of Mid–Cities, NA (In re Williams),* 61 B.R. 567, 570 (Bankr.N.D.Tex.1986).

The United States Supreme Court has given a very expansive interpretation to the meaning of property of the estate:

Both the congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggest that Congress intended a broad range of property to be included in the estate.

\* \* \* \* \* \*

§ 541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code. Several of these provisions bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced.

*United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–205, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983).

The Supreme Court has also observed that property of the estate is generally defined by state law:

Property interests are created and defined by state law Unless some federal interest requires a different result. there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.

*Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) (holding that question of whether security interest in property extends to rents and profits is to be decided by state law). This view has also been echoed by the United States Court of Appeals for the Sixth Circuit: "The Bankruptcy Code does not define a debtor's interest in property: the answer to that question must be made after reference to state law." *White v. White (In re White),* 851 F.2d 170, 173 (6th Cir.1988) (citations omitted) (bankruptcy court did not abuse discretion in lifting automatic stay to allow state court divorce action to proceed). Likewise, the Sixth Circuit has stated, "While the nature and extent of the debtor's interest are determined by state law 'once that determination is made, federal bankruptcy law dictates to what extent that interest is property of the estate.'" *Bavely v. United States (In re Terwilliger's Catering Plus, Inc.),* 911 F.2d 1168, 1172 (6th Cir.1990) (citations omitted) (state's lien interest on liquor license was inchoate at time federal tax lien was perfected). Accordingly, in order to determine the parties' respective property interests, this court must consider the applicable state law.

### B. *Passage of Title Under the Michigan Uniform Commercial Code*

The parties agree that Michigan law is controlling in this case with respect to the crucial issue of whether title to the Tooling passed from Hi–Tech to Debtors at the time the Tooling was delivered for testing

### 1. *No Passage of Title by Explicit Agreement*

Passage of title is governed by section 2401 of the Uniform Commercial Code, as adopted by Michigan, which provides in part:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (section 2501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this act. *Any re-*

*tention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.* Subject to these provisions and to the provisions of the article on secured transactions (article 9), *title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.*

Mich. Comp. Laws Ann. § 440.2401(1)(emphasis added). The first issue to be addressed is whether there was any explicit agreement between the parties that would govern the passage of title. *See generally Comber Tool and Mold Engineering v. General Motors Corp.*, 853 F.Supp. 238, 240–41 (E.D.Mich.1993) ("Under the Michigan Commercial Code, title to specially identified goods passes as expressly agreed by the parties.")

### (a). *No Explicit Agreement that Hi–Tech Would Retain Title*

At trial and upon reconsideration, Hi–Tech has argued that there was an agreement between the parties that title would remain with Hi–Tech while the Tooling was being tested by Debtors. In effect, Hi–Tech argued that there was a bailment which prevented title from passing to Debtors while the Tooling was in their possession for testing. Hi–Tech's representatives testified at trial that it was their understanding that the Tools would be delivered only for the "temporary purpose of testing" and that they would be returned to Hi–Tech upon completion of test runs. *See, e.g.,* Testimony of Calvin DeGood, Transcript Vol.2, p. 111 Tes-

timony of Paul Bogardus, Transcript Vol.2, p. 143. Moreover, Debtors' Senior Tool Engineer, Michael Cole, also testified on cross examination that at least some of the disputed Hi–Tech Tooling had been shipped to Target merely for the "temporary purpose of obtaining some sample parts" and that the Tooling was to be returned to Hi–Tech after additional work after testing. *See* Testimony of Michael Cole, Transcript Vol. 1, pp. 122–23.

■ In the initial bench opinion, this court determined that, in contrast to Wolverine, there was no express bailment agreement between Hi–Tech and the Debtors that would affect the passage of title when the Tooling was delivered to Debtors for testing.[7] Upon careful review of the testimony, this court remains convinced that there was not sufficient evidence in the record to support a finding that there was an express bailment agreement similar to that which was negotiated between Wolverine and Debtors.

### (b). *No Explicit Agreement to Pass Title to Debtors*

Although Hi–Tech did not succeed in establishing the existence of an express bailment, the ultimate burden of proof remained on the Debtors to demonstrate an explicit agreement whereby title to the Tooling transferred to the Debtors either upon delivery or after the testing was completed. In his closing argument, Debtors' counsel conceded that there was no document signifying that Debtors had accepted the Tooling as completed at the time it was delivered for testing purposes. *See* Transcript, Vol.2, p. 285. A careful review of the trial transcripts

---

7. Based upon the evidence presented at trial, this court ruled that the Debtors had paid in full for two of the tools that were being held by Wolverine and that these tools were property of the estates and subject to immediate turnover. *See* Bench Opinion, Transcript Vol.3, p. 19. With respect to the five remaining tools held by Wolverine, this court concluded that these tools were subject to an express oral agreement between the parties and that the tooling was provided to the Debtors for the sole purpose of testing. This finding was supported by the uncontradicted testimony of representatives of both Wolverine *and* a former employee of the Debtor who was a party to the agreement. This finding was also consistent with the circumstantial evidence

which demonstrated that Wolverine provided each of the tools for testing one at a time and would not release the new tool until the prior one had been returned. Thus, this court concluded that title did not pass to Debtors. Rather, the tools were subject to an express bailment ants Wolverine retained title to the tooling while it was in Debtors' possession for testing purposes. Accordingly, this court held that the five remaining tools were not property of the Debtors' estates and were not subject to turnover. *See* Bench Opinion, Transcript Vol.3, pp. 22–23. This court's findings with respect to Wolverine have not been challenged by the Debtors and are not subject to reconsideration.

fails to disclose any evidence of an oral agreement that title would transfer to Debtors upon delivery for testing. To the contrary, Debtors' engineer, Michael Cole, conceded on cross-examination that he "didn't intend to accept the dies when [he] received them and fully comply with the purchase orders." Transcript, Vol. 1, p. 123. Although the question posed was compound and rather confusing the response can be fairly characterized as stating that he did not intend to accept the goods.

■ Acceptance of goods and passage of title are not necessarily coterminous *See generally* 3A Anderson, Uniform Commercial Code § 2–401:9 (3rd ed. 1995) ("The transfer of title does not determine whether the goods have been accepted. That is determined by UCC § 2–606. While transfer of possession and of title are relevant to whether there has been an acceptance of the goods, neither is controlling." (citations omitted)). As noted above, passage of title is determined by Mich. Comp. Laws Ann. § 440.2401, whereas "acceptance" is controlled by Mich. Comp. Laws Ann. § 440.2606.[8] Thus, assuming that acceptance under section 2606 is even relevant, it is only relevant to the extent that such acceptance constitutes an "explicit agreement" concerning passage of title under section 2401.

■ Debtors argued that they had in effect "accepted by performance" by returning the Tooling to Hi–Tech after testing. However, the mere act of returning the Tooling for additional work does not necessarily signify an intent to accept the goods. Rather, it appears that the delivery of the Tooling for testing purposes was done in the ordinary course of business with the understanding that the Tooling would be returned to Hi-Tech for additional work following completion of the test runs. Thus, without some evidence of a written or oral acceptance, Debtors can not meet their burden of showing that they had accepted the goods under Mich. Comp. Laws Ann. § 440.2606(1)(a)[9]. The Debtors' temporary possession and testing of the Tooling was not necessarily inconsistent with seller's ownership and therefore, there was no acceptance under Mich. Comp. Laws Ann. § 440.2606(1)(c). *See* Bench Opinion (11/29/96). Transcript Vol.3, pp. 29–30.

■ Based on the evidence presented at trial, this court made a finding that "there was never any oral or written acceptance communicated from the debtors to Hi–Tech accepting the goods." *See* Bench Opinion (11/29/96), Transcript Vol.3, p. 29. Upon reading of the relevant testimony, this court remains convinced that the Debtors failed to prove by a preponderance of the evidence that there was an explicit agreement whereby title to the Tooling transferred to Debtors upon delivery of the Tooling for testing or after the completion of testing,

### 2. *No Passage of Title Upon Delivery for Testing*

If the Debtors had produced evidence to show that they had formally accepted the Tools prior to returning them to Hi–Tech, they might have been able to use the same evidence to show an explicit agreement to transfer title pursuant to Mich. Comp. Laws Ann. § 440.2401(1). However, in the absence of any such evidence, this court must look to the default rule in section 2401(2) which governs the passage of title where there is no express agreement.

8. Section 2606 of the Michigan UCC provides in part:

**440.2606. Acceptance of goods**
(1) Acceptance of goods occurs when the buyer
 (a) *after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity;* or
 (b) fails to make an effective rejection but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c)does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.
(2) Acceptance of a part of any commercial unit is acceptance of that entire unit.
Mich. Comp. Laws Ann. § 440.2606 (emphasis added),

9. Section 2606(1)(b) which pertains to failure to make an effective rejection does not apply to the facts presented at trial.

Section 2401(2) of the Michigan UCC provides as follows:

> (2) *Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods,* despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading.
>
> (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but
>
> (b) *if the contract requires delivery at destination, title passes on tender there.*

Mich. Comp. Laws Ann. § 440.2401(2)(emphasis added).

### (a). *Delivery of Incomplete Tools Does Not Prevent Passage of Title*

Much of the testimony at trial concerned the extent to which the Tooling was "completed" at the time it was delivered by Hi–Tech for testing.[10] Hi–Tech argues that title could not transfer because the Tooling was not 100% complete, and hence was nonconforming at the time it was delivered to Debtors for testing. *See, e.g.,* Hi–Tech's Amended Brief in Support of Motion for Reconsideration and/or New Trial, p. 11—12. In response, Debtors argue that the Tools were virtually complete at the time of delivery and were only returned to Hi–Tech for final "tweaking." Thus, Debtors contend that the title passed upon delivery for testing, even if the Tools were technically nonconforming. *See, e.g.,* Brief of Debtors in Opposition to Hi–Tech Machine and Tool, Inc.'s Motion for Reconsideration, pp. 6–7.

Based on the testimony presented by both parties at trial, this court found that the Tools were "substantially complete" at the time they were delivered to Debtors for testing purposes. *See* Bench Opinion Transcript, Vol.3, p. 28. Because the Tooling was substantially complete at the time it was delivered to Debtors for testing, this court concluded that title passed from Hi–Tech to Debtors and remained with Debtors even though the Tooling was subsequently returned to Hi–Tech for completion. *See* Bench Opinion Transcript, Vol.3, p. 28. Upon reconsideration, this court remains convinced that its factual finding was correct, i.e., the Tooling was "substantially complete" at the time it was delivered for testing purposes. However, upon reconsideration, this court has reached a different conclusion with respect to the legal significance of this factual finding

 The comments to Mich. Comp. Laws Ann. § 440.2401 state that title may pass upon delivery even if the goods are nonconforming. In discussing the passage of title upon delivery under section 2401, the commentary states, "These rules also appear to be applicable even though the goods shipped do not conform to the contract." *See* Mich. Comp. Laws Ann § 440.2401, Comment 2(a). Thus the fact that there was some minor work that remained to be done on the tools did not prevent the passage of title. Thus, the issue is not whether the goods were complete at the time of delivery; rather, the issue is whether "the seller completes his performance with respect to the physical delivery of the goods." *See* Mich. Comp. Laws Ann. § 440.2401(2). If so, title passes; if not, title remains with the seller.[11]

---

**10.** The fact that test parts were run using the Tools demonstrates that they were substantially complete. Moreover, all of the parties agreed that the only remaining work to be done after testing was the application of a final protective coating and the installation of sensors. These "finishing touches" were relatively minor both in terms of the time and money required to complete the job compared to the manufacture of the Tools themselves. *See, e.g.,* Testimony of Michael Cole. Transcript, Vol. 2, pp. 34–35; Testimony of Calvin DeGood, Transcript Vol. 2, p. 110.

**11.** In the course of delivering the bench opinion, this court used a hypothetical to illustrate the view that the delivery of substantially completed goods would result in the transfer of title even if the goods proved to be only partially complete and hence non-conforming. *See* Bench Opinion Transcript, Vol.3, p. 28. In the hypothetical, this court posited the sale of ink pens which were delivered to the buyer without the ink cartridges. Under these circumstances, the court concluded that the buyer could gain title to the pens upon delivery, even though the goods were noncon-

### (b). *Debtors Failed to Prove Delivery at Destination*

■ Attached is a chart which summarizes the evidence with respect to the delivery terms and the actual delivery of each of these four tools. This summary shows that each of the four tools was identified in a separate "quotation" prepared by Hi–Tech. In each case, the quotation stated that the tool would be shipped to "ALOFS MANUFACTURING, INC." *See* attached summary. *See also* Hi–Tech's Exhibits E, G, I, and C. However, with respect to each of the tools still in dispute, the subsequent purchase orders issued by Target, directed Hi–Tech to deliver the tools "FOB" to "TARGET DOCK # 22." See attached summary. *See also* Hi–Tech's Exhibits F, H, J, and D. In each case, the purchase order was issued after the original quotation. Thus, the delivery terms contained in the purchase orders are controlling. *See generally* Mich. Comp. Laws Ann. § 440.2207 ("Additional or different terms in acceptance; contract by conduct").

■ In order to prove passage of title upon delivery under section 2401(2), Debtors must prove that the delivery was completed to the proper destination in accordance with the contract. *See supra* Mich. Comp. Laws Ann. § 440.2401(2). The terms of delivery are very specific, i.e., "F.O.B. TARGET DOCK # 22." The term "F.O.B." (which means "free on board") mandates that "when the term is F.O.B. the place of destination, the seller must at his own expense and risk transport the goods to that place and there tender delivery of them in the manner provided in this article (section 2503)." *See* Mich. Comp. Laws Ann. § 440.2319(b).

■ There is ample evidence in the record to support the conclusion that the disputed Tooling was delivered to either Target or Alofs (or "drop shipped" to ITS in Flint), for testing purposes. *See* Attached

Summary However, there is no evidence whatsoever in the record to show that delivery was made to Target Dock # 22 as required under the contracts. At trial, the Debtors failed to differentiate between the related companies regarding delivery or ownership of the disputed Tooling, *See, e.g.,* Cross–Examination of Calvin J. DeGood, Transcript Vol.2, p.115; Cross–Examination of Paul Bogardus, Transcript Vol.2, p. 143. Nevertheless, on cross-examination by Hi–Tech, the Debtors' representatives admitted that Alofs and Target were separate companies. *See* Testimony of David Kuczera, Transcript Vol. 1, p. 81; Testimony of Michael Cole, Transcript, Vol. 1, p. 1 24. Moreover, this court takes judicial notice of the fact that Alofs and Target have filed separate petitions for reorganization and although the cases are being jointly administered, they have not been substantively consolidated. Thus, delivery to Alofs does not constitute delivery to Target for purposes of establishing passage of title. Moreover, even assuming that the Tools were delivered to Target's facility for testing, there was no evidence to show that they were delivered to "Dock # 22" as specifically required in the contract. Thus, the Debtors' failure to prove compliance with the delivery terms negates a possible conclusion that title passed upon delivery.

### (c). *Debtors Failed to Prove Final Delivery*

■ Although the Tools were substantially complete at the time they were delivered to Debtors, the parties' witnesses agreed that the Tools were only being delivered for testing purposes and that they would be returned to Hi–Tech for further work regardless of the outcome of the tests. *See* Testimony of Michael Cole, Transcript Vol. 1, pp. 105, 108; Testimony of Calvin DeGood, Transcript Vol. 2, p. 111; Testimony of Paul Bo-

forming. The buyer could then choose to accept or reject the partially completed goods and pursue its remedies for breach of contract under the UCC. *See generally* Mich. Comp. Laws Ann. § 440.2714 ("Accepted goods; buyer's damages for breach"). However, there was one key fact missing from this hypothetical scenario which resulted in a faulty analogy, i.e, an agreement that the buyer would test the pens and then

return them to the seller for completion. The addition of this crucial fact leads to a different conclusion because there was no final delivery; rather, it was understood by both parties that the goods would be returned to the seller upon completion of the testing. Under these circumstances, title remains with the seller until the goods are completed and are redelivered to the buyer for what is presumably the last time.

gardus, Transcript Vol. 2, p. 143. Thus, the delivery to Debtors was not a *final* delivery in the sense that Hi–Tech had completed its performance. This distinction between final delivery and delivery for testing is crucial because in the former case title would transfer, whereas in the later case, title does not.

This factual scenario must be distinguished from the situation in which the seller has completed its performance and has made final delivery to the buyer, but seeks to retain title until the buyer has completed payments of the goods. Under these circumstances, the UCC makes it clear that title transfers upon delivery and that seller retains only a lien interest in the goods, notwithstanding any agreement to the contrary. *See* Mich. Comp. Laws Ann. § 440.2401(1) and (2). The reason for this limitation is obvious. In the absence of such a rule, sellers would always seek to include standard form language in their invoices by which they would retain title in the goods until fully paid and in this way circumvent the requirements for perfecting a security interest under Article 9 of the UCC. In order to prevent this type of overreaching by sellers, courts have recognized that title transfers upon final delivery, regardless of any agreement to the contrary. For example, in a turnover proceeding involving Michigan law, the United States Bankruptcy Court for the Eastern District of Michigan has stated:

> " '[a]ny retention or reservation by the seller of the title (property) in good shipped or delivered to the buyer is limited to a reservation of a security interest.' Thus [seller's] contention that his ownership interest has not been transformed into a security interest must fail if, notwithstanding the fact that he purported to retain legal title, the machine was shipped or delivered to the Debtor."

*Uni–Products, Inc. v. Bearse (In re Uni–Products)*, 153 B.R. 764, 767–68 (Bankr. E.D.Mich.1993) (citations omitted). In *Uni–Products*, the bankruptcy court granted summary judgment in favor of a debtor which sought a determination of ownership of a machine, even though written agreement specified that seller would retain title to machine until debtor-buyer had completed payments. There are two key facts that distinguish *Uni–Products* from this proceeding. First, unlike *Uni–Products*, there was no express agreement whereby Hi–Tech sought to retain title until it had been paid. Second, and more importantly, in *Uni–Products*, there was no expectation that the machinery would be returned to seller after delivery, whereas based on the facts presented in this proceeding, the parties understood that the Tools would be returned to Hi–Tech after testing for further work.

 Thus, the Debtors have failed to meet their burden of establishing by a preponderance of the evidence that they had taken final delivery of the Tooling such that title would have passed Mich. Comp. Laws Ann. § 440.2401(2). Because title did not pass to Debtors under Michigan law, the Tooling did not become part of the Debtors' estates.[12] Therefore, the Debtors were not entitled turnover of the Tooling after they returned it to Hi–Tech for further work.

## IV. CONCLUSION

Based on the foregoing analysis, it should be obvious that this was a very difficult controversy; indeed, upon reflection, the court has changed its conclusion. This court made its initial ruling during a holiday weekend following a two-day trial The exigent circumstances required an immediate ruling without the luxury of reviewing the transcripts or conducting significant legal research. Thus, almost immediately after issuance of its bench opinion, this court was amenable to a motion for reconsideration because it gave the parties an opportunity to brief the issues and allowed the court to review the record in detail and give the arguments further consideration. Nevertheless, the parties have been unable to provide the court with any controlling legal authority. This is understandable because this court has been unable to independently discover any cases that are precisely on point, notwithstanding substantial independent legal

---

12. It should be noted the Debtors had an equitable interest in the tooling pursuant to the various executory contracts. However, to obtain the Tooling, the Debtors are required to assume and perform their part of the agreement, including paying the remaining contract price.

research that has been conducted since completion of trial. In the absence of any controlling case law, this court must apply the provisions of the Michigan Uniform Commercial Code and the Bankruptcy Code to the factual evidence presented at trial. Although there was substantial completion of the Tooling, there was no final delivery in accordance with the contract terms; therefore, title did not pass.

For the reasons set forth above, this court concludes that the Debtors having failed to carry their burden of proof under section 542 of the Bankruptcy Code. Accordingly, upon reconsideration, the Debtors' motion for turnover is hereby DENIED. A separate order will be prepared granting Hi–Tech's request for the release of the funds currently held in escrow.[13]

| Hi–Tech Part No. | Delivery Terms in Quotation | Delivery Terms in Purchase Order | Designated Co. in Debtors' Ex. 4 | Testimony Concerning Place of Actual Delivery |
|---|---|---|---|---|
| 57831 | "Alofs. Mfg., Inc." Ex. E—10/19/95 | "Target dock no. 22" Ex. F—2/27/96 | Target | Niether Alofs nor Target –Cole T1, p111,125 Target then to Alofs? –Nelson T2,p55–56 Alofs–DeGood T2,p104,116 Target drop ship to ITS? –Bogardus T2,p143,152 |
| 57832/35 | "Alofs.Mfg.,Inc." Ex.G—1/3/96 | "Target dock no. 22" Ex.H—4/26/96 | Alofs | Target drop ship to ITS –Cole T1, p103, 107, 112, 123,- T2,p33; –DeGood T2,p105,115 –Bogardus T2,p143,152 |
| 57833/36 | "Alofs.Mfg.,Inc." Ex.I—1/3/96 | "Target dock no. 22" Ex.J—2/27/96 | Target | Target drop ship to ITS –Cole T1, p103, 107, 112, 123, T2,p33; –DeGood T2,p105,115 –Boardus T2,p143,152 |
| 57841/42 | "Alofs.Mfg.,Inc." Ex.C—10/19/95 | "Target dock no. 22" Ex.D—2/27/96 | Target | Target drop ship to ITS –Cole T1p107,112,123; –Bogardus T2,p143,152; –Nelson T2,p58–62 Not shipped to ITS –Cole T2, p33 |
| 74404 Bat. Clamp | "Alofs,Mfg.,Inc." Ex.A—8/12/95? | "ALOFS" Ex.B—4/25/96 | Alofs | Never delivered/Undisputed –Cole T1,p103,112 |
| 63175/76 | | "ALOFS" | Alofs | Fully Paid/Not in dispute |

13. The order will also provide that because the Tooling cannot be returned to Hi–Tech, the escrow funds shall be released to Hi–Tech. If there exists any dispute as to the proper amount of the escrow funds to be released, a motion may be filed and the court will conduct an expedited hearing.